SO ORDERED.

SIGNED April 1, 2013.



ROBERT SUMMERHAYS
UNITED STATES BANKRUPTCY JUDGE

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION


IN RE:

GULF FLEET HOLDINGS, INC., ET AL,            CASE NO. 10-50713

    Debtors                                  Chapter 11

----------------------------------------------------------------
ALAN H. GOODMAN, TRUSTEE

    Plaintiffs-in-Intervention

VERSUS                                       ADVERSARY NO. 11-05006

H.I.G. CAPITAL, LLC, ET AL,

    Defendants-in-Intervention

----------------------------------------------------------------
REASONS FOR DECISION
----------------------------------------------------------------

    This is an action brought by Alan H. Goodman, the trustee of

the Gulf Fleet Liquidating Trust (with respect to Mr. Goodman, the

"Trustee" and with respect to the Gulf Fleet Liquidating Trust, the

"Trust") against H.I.G. Capital, LLC and other defendants. The Trustee's claims arise out of H.I.G.'s leveraged buyout and subsequent management of Gulf Fleet Holdings, Inc. and its affiliates ("Gulf Fleet" or "Debtors"). H.I.G. and the other defendants filed a motion to dismiss the Trustee's complaint under Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure. The court took the motions under advisement and, after considering the parties' arguments, the Trustee's complaint, and the relevant authorities, the court GRANTS the defendants' motions to dismiss IN PART, and DENIES the motions IN PART as set forth herein.

**BACKGROUND**

Prior to bankruptcy, Gulf Fleet owned and operated a fleet of supply vessels used to support oil and gas exploration and production companies in the Gulf of Mexico and other locations. (Trustee's Complaint-in-Intervention ("Complaint") at ¶ 17). Gulf Fleet was formed in 1999 by Michael and Darlene Hillman. (Id.). H.I.G. Capital, LLC is a private investment firm with its principle place of business in Miami, Florida. (Id. at ¶ 9). H.I.G. Capital operates through various subsidiaries and affiliates, including defendants H.I.G. Gulf Fleet Acquisition, LLC, H.I.G. GP-II, H.I.G. Capital Partners IV, L.P., H.I.G. Advisors IV, L.L.C., Gulf Fleet Tiger Holdings, Inc., Gulf Fleet Tiger Acquisition, LLC, and Gulf Fleet Financing, LLC (collectively, the "H.I.G. Defendants").

(Complaint at ¶¶ 10-14, 20-22). In May 2007, the Hillmans and H.I.G. entered into a leveraged buyout transaction (the "LBO"). The Hillmans sold all of their ownership interest in Gulf Fleet to H.I.G. in exchange for $23.5 million in cash and a 35% equity interest in the new Gulf Fleet entity created as a result of the buyout. (Id. at ¶ 19). As a result of the LBO, H.I.G. held a 65% controlling interest in Gulf Fleet. (Id.). According to the Trustee, H.I.G. Gulf Fleet Acquisition, LLC, ("Gulf Fleet Acquisition") was a "shell" Delaware LLC and "indirectly wholly-owned subsidiary of H.I.G. Capital" that was formed in connection with the LBO to hold the stock of Gulf Fleet Holdings. (Complaint ¶¶ 10-11). The Trustee alleges that H.I.G. Capital controlled Gulf Fleet through Gulf Fleet Acquisition and H.I.G. GP-II. (Complaint at ¶¶ 10-12). After the LBO, Gulf Fleet Holdings, Inc. had three direct subsidiaries: Gulf Fleet Offshore, LLC ("GFO"), Gulf Ocean Marine Services, LLC ("GOMS"), and Gulf Fleet Management, LLC. GOMS, in turn, was the parent company for seven subsidiaries, including Gulf Fleet, LLC, Hercules Marine, LLC, Gulf Worker, LLC, Gulf Service, LLC, Gulf Wind, LLC, Star Marine, LLC, and Gulf Fleet Marine, Inc. (all of these entities referred to collectively as "Gulf Fleet").

The LBO was funded by a loan underwritten by a syndicate of banks led by Comerica Bank. This senior loan was secured by Gulf

-3-

Fleet's property and certain accounts receivable. The senior loan included a term loan of $42 million and a revolving credit commitment of $10 million. (Complaint at ¶ 20). The Trustee alleges that Gulf Fleet received the full $42 million term debt and drew approximately $4 million under the revolving credit commitment at the time the LBO was closed on May 1, 2007. The Trustee further alleges that Brightpoint Capital Partners Master Fund, L.P. ("Brightpoint") extended Gulf Fleet an additional $6 million subordinated loan with a maturity date of May 1, 2012. According to the Trustee, the proceeds of these loans were used to pay Gulf Fleet's pre-LBO debt and to fund the $23.5 million cash paid to the Hillmans. (Complaint at ¶ 23). The Trustee further alleges that, out of the loan proceeds, Gulf Fleet ultimately retained $500,000 cash.

The Trustee contends that, after the LBO, H.I.G. "dominated and controlled" Gulf Fleet. Specifically, H.I.G. employees - including defendants Jeff Zanarini, Jonathon Fox, and Anthony Tamer - were appointed to the board of directors of the various Gulf Fleet entities. (Complaint at ¶ 24). The Trustee contends that these H.I.G. employees prevented Michael Hillman from attending board meetings and withheld information from Mr. Hillman. (Complaint at ¶ 24). The Trustee also alleges that H.I.G. and its employees managed Gulf Fleet so as to benefit H.I.G. at the expense of Gulf Fleet, its minority shareholders, and its creditors.

The Trustee alleges that H.I.G. required Gulf Fleet to enter into a Professional Services Agreement ("PSA") and Consulting Services Agreement ("CSA"). (Complaint at ¶ 33). These agreements provided that H.I.G. would provide professional advice and assist in evaluating potential acquisitions in exchange for an annual management fee of $500,000 as well as other fees set forth in the agreements. (Id.). According to the Trustee, H.I.G. "provided no value to Gulf Fleet for these arrangements." (Id. at ¶ 34). The Trustee alleges that the agreements "were an artifice used to funnel money from Gulf Fleet to other arms of the H.I.G. enterprise." (Id.).

The Complaint also addresses the sale of Gulf Fleet's interests in the construction contract for the *M/V Gulf Tiger.* Gulf Fleet contracted with Thoma-Sea Shipbuilders, LLC to construct the *M/V Gulf Tiger* in July 2007. The cost of the contract was approximately $17.975 million, and Gulf Fleet paid $4 million as a deposit for the vessel. (Id. at ¶ 50). Gulf Fleet assigned its rights to the *M/V Gulf Tiger* construction contract to an H.I.G. subsidiary, GF Tiger Acquisition, in July 2008. According to the Trustee, GF Tiger Acquisition paid Gulf Fleet $8 million for the contract. (Id. at ¶ 51). After the assignment, H.I.G.'s representatives at Gulf Fleet required Gulf Fleet to continue supporting the construction of the *M/V Gulf Tiger* even though Gulf

-5-

Fleet no longer had an interest in the contract. (Id. at ¶ 52).
According to the Trustee, defendant Jeff Zanarini assured the Chief
Financial Officer of Gulf Fleet that H.I.G. would reimburse Gulf
Fleet for the expenditures, but no reimbursements were ever made.
(Id.). According to the Trustee, Gulf Fleet provided over $1
million in equipment, materials, and labor in connection with the
construction of the *M/V Gulf Tiger* solely for the benefit of GF
Tiger Acquisition and H.I.G. (Id. at ¶ 53). The Trustee contends
that H.I.G. refused to reimburse these expenses even after Gulf
Fleet made a demand for payment. (Id. at ¶ 54).

After the LBO, Gulf Fleet entered into a factoring agreement
with GF Financing (the "Factoring Agreement"), an H.I.G.
subsidiary. (Id. at ¶ 58). According to the Trustee, Michael
Hillman objected to this Factoring Agreement. Under the terms of
the agreement, GF Financing could purchase up to $4 million in
accounts receivable from Gulf Fleet. (Id. at ¶ 59). The Trustee
alleges that Gulf Fleet assigned $2,897,400 in accounts receivable
to GF Financing in November 2009. The Trustee further alleges that
this agreement and assignment of accounts receivable violated the
covenants of the senior loan with Comerica Bank, and that Comerica
Bank demanded the return of the collateral when it learned of the
assignment. (Id. at ¶ 61). As a result, Gulf Fleet and GF
Financing restructured the Factoring Agreement to cover only

-6-

"ineligible accounts" as defined in the documents governing the senior loan by Comerica. The Trustee contends that the purpose of the Factoring Agreement was to provide liquidity for Gulf Fleet without requiring H.I.G. to risk a capital contribution. (<u>Id</u>. at ¶ 62).

The Trustee alleges that H.I.G. undercapitalized Gulf Fleet by refusing to inject new capital into the company and its affiliates. Instead, H.I.G. attempted to fund Gulf Fleet's short-term cash needs through the Factoring Agreement and short-term promissory notes issued by H.I.G.'s affiliates. For example, in January 2010, Gulf Fleet issued two promissory notes to GF Financing for $5.5 million and approximately $2.9 million. (<u>Id</u>. at ¶ 63). According to the Trustee, the $2.9 million note was intended to replace Gulf Fleet's obligations under the amended Factoring Agreement for the accounts receivable that had to be returned to cure the breach of the covenants in the senior loan documents. (<u>Id</u>.). According to the Trustee, Gulf Fleet had no obligation to enter into the promissory note because the assignment of the accounts receivable was without recourse. (<u>Id</u>.). The Trustee further alleges that both promissory notes were essentially a "*de facto* equity contribution" disguised as a loan. (<u>Id</u>. at ¶ 66). In this regard, the Trustee points to the terms of the promissory notes, which gave GF Financing the right to convert the balance of the notes into

-7-

stock for $10 per share at any time before maturity. (Id. at ¶
64). The Trustee characterizes these notes as "the perfect
investment vehicle" because if Gulf Fleet succeeded "the notes
would become an equity contribution and H.I.G. would own nearly all
of Gulf Fleet," but if Gulf Fleet failed "H.I.G. would claim the
notes were debt." (Id. at ¶ 67). The Trustee also alleges that
H.I.G. intended to undercapitalize Gulf Fleet and to take actions
that solely benefitted H.I.G.'s interests at the expense of Gulf
Fleet and its creditors. Specifically, the Trustee alleges:

- H.I.G. and its representatives on Gulf Fleet's board of
  directors effectively excluded Michael Hillman from key board
  meetings; (Complaint at ¶ 70).

- H.I.G. directed Gulf Fleet to provide false financial reports
  to Comerica;

- H.I.G. delayed Gulf Fleet's bankruptcy filing to shield the
  LBO transactions and transfers in connection with the LBO from
  liability under federal and state avoidance statutes;

- H.I.G. caused Gulf Fleet Acquisition to merge with GOMS to
  "avoid liability for abusing the corporate forum and incurring
  inter-company receivables owed by GF Acquisition to one or
  more debtors"; (Id. at ¶ 56).

- after the LBO, Gulf Fleet was insolvent because its asset
  values were worth less than what was reflected on Gulf Fleet's
  books – "when the reserves needed for capital expenditures and
  replacement are taken into account, along with accurate vessel
  condition, Gulf Fleet was insolvent and assets at fair value
  were exceeded by its liabilities since the LBO on May 1,
  2007"; (Id. at ¶ 42).

- because of Gulf Fleet's insolvency, it had to borrow $4
  million from Michael Hillman and H.I.G. in February 2008 and
  repaid that insider loan in preference to other creditors.
  (Id. at ¶ 44.).

-8-

Gulf Fleet and its affiliated entities filed for relief under Chapter 11 of the Bankruptcy Code on May 14, 2010. The court ultimately confirmed a liquidating plan of reorganization for the substantively consolidated Gulf Fleet entities after an evidentiary hearing on April 26, 2011. The confirmed plan provided for the creation of the Trust and Mr. Goodman was ultimately appointed Trustee. The confirmed plan assigned certain causes of action to the Trust. The present action was initially commenced by Michael Hillman. The Trustee subsequently intervened as plaintiff. The Trustee's Complaint asserts 14 separate counts: (1) Fraudulent transfer claims under 11 U.S.C. §§ 544, 548, and 550, (2) a claim to recharacterize H.I.G.'s debt as equity, (3) simulation under Louisiana Civil Code Article 2027, (4) a claim for subordination, (5) state law breach of fiduciary duty claims, (6) state law breach of duty of loyalty and tort, (7) aiding and abetting breach of fiduciary duty, (8) delictual action and conversion, (9) unjust enrichment, (10) quantum meruit, (11) partnership liability, (12) single business enterprise, (13) a direct action against the defendants' insurance carrier, and (14) a request for attorney fees. The H.I.G. Defendants subsequently filed the present Motion to Dismiss, and requested dismissal of all of the Trustee's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

-9-

Brightpoint also filed a separate Motion to Dismiss and Motion for More Definite Statement under Rule 12(e) of the Federal Rules of Civil Procedure.

**DISCUSSION**

**A.  Applicable Standards Under Rules 12(b)(6), 9(b), and 12(e)**

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure provides that Rule 12(b)(6) of the Federal Rules of Civil Procedure applies in adversary proceedings.  Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b) (6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570; <u>see also</u> <u>Elsensohn v. St. Tammany Parish Sheriff's Office</u>, 530 F.3d 368, 372 (5th Cir. 2008) (quoting <u>Twombly</u>, 550 U.S. 544, 127 S.Ct. at 1974, 167 L.Ed.2d 929).  A claim satisfies the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

-10-

_Twombly_'s plausibility standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." _Iqbal_, 129 S.Ct. at 1949(internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." _Twombly_, 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." _Id_. (quotation marks, citations, and footnote omitted). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. _Sonnier v. State Farm Mutual Auto. Ins. Co._, 509 F.3d 673, 675 (5th Cir. 2007); _Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit_, 369 F.3d 464, 467 (5th Cir. 2004); _Baker v. Putnal_, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. _Spivey v. Robertson_, 197 F.3d 772, 774 (5th Cir. 1999), _cert_. _denied_, 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 274 (2000). The pleadings include the complaint and any documents attached to it. _Collins v. Morgan Stanley Dean Witter_, 224 F.3d 496, 498-99 (5th Cir. 2000). The court may also consider

-11-

documents that are attached to the motion to dismiss if the documents are specifically referenced in the complaint and are "central" to the plaintiff's claim. <u>Sullivan v. Leor Energy, LLC</u>, 600 F.3d 542, 546 (5th Cir. 2010).

Rule 9(b) of the Federal Rules of Civil Procedure imposes additional requirements for pleading claims of fraud. Rule 9(b) requires the plaintiff to plead the circumstances constituting fraud with particularity. <u>See</u> Fed R. Civ. P. 9(b); <u>Tuchman v. DSC Communications Corp.</u>, 14 F.3d 1061, 1068 (5th Cir. 1994). To satisfy Rule 9(b), a plaintiff must allege the identity of the person making a fraudulent statement, the time, place and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated. <u>Tuchman</u>, 14 F.3d at 1061. This standard requires sufficient factual detail to lend some measure of substantiation to a claim that the defendant committed fraud. <u>Id</u>. Rule 9(b) applies not only to fraud claims, but also to "non-fraud" claims that are based upon allegations of fraud. For example, a breach of fiduciary duty claim is not generally subject to Rule 9(b). However, if a breach of fiduciary duty claim is grounded in whole or in part on allegations of fraud, the allegations of fraud must comply with Rule 9(b). Similarly, fraudulent transfer claims based on allegations of actual fraud are subject to the pleading standards of Rule 9(b).

-12-

Under Rule 12(e) of the Federal Rules of Civil Procedure, a defendant may move for a more definite statement of a pleading "which is so vague or ambiguous that the party cannot reasonably prepare for a response." Fed. R. Civ. Pro. 12(3). Courts have traditionally viewed Rule 12(e) motions with disfavor given the liberality of notice pleading and the availability of discovery to obtain the information needed for a party to present its case. See, e.g., Mitchell v. E.Z. Way Towers, Inc., 269 F.2d 126, 132 (5th Cir. 1959); 5A C. Wright & A. Miller, Federal Practice and Procedure § 1377 (2nd ed. 1990). Relief under Rule 12(e) is limited to cases where the "complaint is ambiguous or does not contain sufficient information to allow a responsive pleading to be framed." Beanal v. Freeport-McMoran, Inc., 197 F.3d 161, 164 (5th Cir. 1999).

**B. Count 1: Fraudulent Transfer**

**1. Elements of the Trustee's Section 548 Claim.**

11 U.S.C. § 548(a)(1) allows a trustee to avoid any transfer of the debtor's interest in property if the transfer was the result of actual or constructive fraud. Section 548(a)(1)(A) governs "actual" fraud and allows a trustee to avoid a transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became...indebted." Section 548(a)(1)(B) in turn, governs "constructive" fraud and requires proof that (1) the debtor

-13-

had an interest in property; (2) a transfer of that interest occurred within two years of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the transfer resulted in no value for the debtor or the value received was not "reasonably equivalent" to the value of the transferred property interest. 11 U.S.C. § 548(a)(1)(B); <u>BFT v. Resolution Trust Corp</u>., 511 U.S. 531, 535 (1994). With respect to both actual and constructive fraud, a trustee cannot challenge transfers that occurred more than two years before the filing of the bankruptcy petition even if all of the other elements of a fraudulent transfer claim are satisfied. 11 U.S.C. § 550(a) outlines the Trustee's remedies. Section 550(a) provides that a trustee "may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).

**2. Elements of the Trustee's Section 544 Claim and Choice of Law.**

Under 11 U.S.C. § 544(b), a trustee succeeds to the rights of an unsecured creditor to avoid a transaction under non-bankruptcy law. <u>See</u> <u>In re Moore</u>, 608 F.3d 253, 260 (5th Cir. 2010). In other

-14-

words, if "an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use section 544(b) to step into the shoes of that creditor and 'avoid' the debtor's transfer." Id. The Trustee's rights under section 544 arise under federal law, but the scope of the rights are defined by non-bankruptcy law. Id.; In re Cyrus II Partnership, 413 B.R. 609, 614 (Bankr. S.D. Tex. 2008) (describing section 544(b) claims as "unique because they exist only to the extent of applicable state law," but the claims "are federal causes of action rooted in federal bankruptcy law and policy"). In many cases, the parties do not dispute the applicable state or non-bankruptcy law that serves as a predicate for a section 544(b) claim. Here, however, the Trustee grounds his section 544(b) claim on both Louisiana and Delaware law. Specifically, the Trustee relies on Louisiana's revocatory action under Louisiana Civil Code Article 2036, which provides that an "obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency." With respect to Delaware law, the Trustee relies on Delaware Code Ann. Title 6, §§ 1304 and 1305. Section 1304(a) provides that a transfer or obligation is fraudulent as to a creditor, "whether the creditor's claim arose before or after the

-15-

transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with the actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (a) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Section 1305(a) provides that a transfer or obligation is fraudulent as to a creditor "whose clam arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Del. Code Ann. Title 6, § 1305. The H.I.G. Defendants argue that only Louisiana law applies to the Trustee's section 544(b) claims.

Choice of law is important in the present case because the "reachback" period of the relevant Delaware and Louisiana statutes differ. The Delaware provisions cited by the Trustee allow creditors to avoid transactions occurring up to four years prior to

-16-

the filing of a bankruptcy case.  Del. Stat. Ann. Title 6, § 1309.

In contrast, a Louisiana revocatory action allows avoidance of

transfers occurring up to three years prior to the bankruptcy

filing.  La. Civ. Code art. 2041.  Here, some of the transfers

challenged by the Trustee fall outside the three-year reachback

period covered by the Louisiana revocatory statute (and,

accordingly, under section 544(b)) if Louisiana law applies.  In

performing a choice of law analysis, the first question that the

court must answer is whether federal or state choice-of-law rules

govern.  In <u>Klaxon Co. v. Stentor Elec. Mfg. Co</u>., 313 U.S.  487

(1941), the Supreme Court held that a court must apply the choice-

of-law rules of the forum in which it sits when the court has

jurisdiction based on diversity of citizenship.  However, because

this court's jurisdiction over the present matter is grounded on 28

U.S.C. § 1334(b), not diversity under 28 U.S.C. § 1332, <u>Klaxon</u> does

not dictate that the court adhere to the forum state's choice-of-law

rules.  Where, as here, the court is not bound by <u>Klaxon</u>, bankruptcy

courts often will apply the choice-of-law rules of the state where

they sit with respect to state law claims that do not implicate

federal policy.  <u>See</u> <u>Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-</u>

<u>Ingram Dev. Co</u>., 642 F.2d 744, 748 (5th Cir. 1981); <u>In re Gaston &</u>

<u>Snow</u>, 243 F.3d 599, 605 (2d Cir. 2001); <u>In re Merritt Dredging Co.,</u>

<u>Inc</u>., 839 F.2d 203, 206 (4th Cir. 1988); <u>Warfield v. Carnie</u>, No.

-17-

3:04-cv-633-R, 2007 WL 1112591, at *7 (N.D. Tex. Apr. 13, 2007).

Although the Trustee's rights under section 544(b) are defined by state law, courts have generally held that federal common law governs the choice-of-law for section 544(b) claims because these claims are ultimately federal causes of action grounded in important federal bankruptcy policy.  See, e.g., In re Cyrus II Partnership, 413 B.R. at 614; In re Best Products Co., Inc., 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), aff'd 68 F.3d 26 (2d Cir. 1995) ("In determining the choice-of-law issue, the court probably would apply federal common law choice-of-law rules because the court possesses federal question jurisdiction over any claim based on section 544(b) of the Bankruptcy Code.").  In Cyrus II Partnership, the court reasoned that section 544(b) claims implicate important federal policy in that the purpose of these avoidance provisions "is to prevent debtors from illegitimately disposing of property that should be available to their creditors."  413 B.R. at 614 (quoting Palmer & Palmer, P.C. v. U.S. Trustee (In re Hargis), 887 F.2d 77, 79 (5th Cir. 1989)).  Accordingly, "these claims are for the benefit of the bankruptcy estate and its creditors."  Id. Where federal choice-of-law principles apply, courts generally refer to the "most significant relationship" approach adopted in the Restatement (Second) Conflict of Laws.  See Cyrus II Partnership, 413 B.R. at 615; In Kaiser Steel Corp., 87 B.R. 154, 158 (Bankr. D. Colo. 1988).

-18-

In applying the Restatement approach, the <u>Cyrus II Partnership</u> court determined that a fraudulent transfer claim under section 544(b) was more in the nature of a tort claim that should be analyzed under section 145 of the Restatement. 413 B.R. at 615. Section 145, in turn, refers to the list of contacts set forth in section 6 of the Restatement and requires the court to determine the state with the most significant relationship to the dispute. <u>See</u> Restatement (Second) of Conflicts of Laws § 145 (1971). Section 145 provides that the following contacts set forth in section 6 should govern the court's choice-of-law analysis:

    (a)   The place where the injury occurred;

    (b)   the place where the conduct causing the injury occurred;

    (c)   the domicile, residence, nationality, place of incorporation and place of business of the parties; and

    (d)   the place where the relationship, if any, between the parties is centered.

<u>Id.</u> at § 145 (1971). The court agrees with the approach taken by the <u>Cyrus II Partnership</u> court.[1] This approach is consistent with

---

[1] The court notes that in <u>Stern v. Marshall</u>, ____ U.S. ____, 131 S.Ct. 2594, 2614 (2011), the Supreme Court suggested that fraudulent transfer actions "resemble state law contract claims...." One court seized on this language in holding that choice-of-law rules for contract claims should be applied to fraudulent transfer claims. <u>In re Century City Doctors Hospital, LLC</u>, 466 B.R. 1, 9 (Bank. C.D. Cal. 2012). The court respectively disagrees with <u>Century City</u>'s reading of this

-19-

the approach taken by other courts as well as the Fifth Circuit. See, e.g., In re Mirant Corp., 675 F.3d 530, 537 (5th Cir. 2012); Best Products Co., Inc., 168 B.R. at 52; In re World Com, Inc., 2003 WL 23861928 (Bankr. S.D.N.Y. 2003). Accordingly, the court will look to sections 145 and 6 of the Restatement in determining which law should apply to the Trustee's section 544(b) claims.

While the Trustee cites both Louisiana and Delaware law, he argues that Delaware law applies because some of the debtor entities were formed under Delaware law. Specifically, Gulf Fleet Holdings, Inc. is a Delaware corporation and Gulf Fleet Services, LLC and Gulf Wind LLC are Delaware limited liability companies. The remaining

language, and concludes that this language in Stern does not undermine the Cyrus II Partnership court's analysis. The language at issue from the Stern opinion was actually a quote from the 1989 case of Granfinanciera, S.A. v. Nordberg, 4922 U.S. 33, 56 (1989) dealing with the question of whether a party had a Seventh Amendment right to a jury trial on a fraudulent transfer claim. The court was merely observing that such a claim more closely resembles a common law contract claim than the type of core bankruptcy matters that address "creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." The Supreme Court's language in Stern cannot, however, be read to hold that, for purposes of the applicable choice-of-law rules, fraudulent transfer claims should be treated as contract claims versus fraud claims. In any event, the court concludes that the relevant choice-of-law analysis under section 145 of the Restatement would also dictate the application of Louisiana law under the applicable choice-of-law rules for contracts. Specifically, section 188 (which pertains to contracts) of the Restatement incorporates many of the same considerations as section 145. Since the challenged transactions were centered in Louisiana--as explained in more detail herein--the court concludes that section 188 would point to Louisiana law.

-20-

debtor entities are Louisiana corporations and Louisiana limited liability companies. When the issue at hand involves the internal affairs of a business entity, the law of the state of formation usually controls the court's choice-of-law analysis. See <u>Lone Star Indus., Inc. v. Redline</u>, 757 F.2d 1544, 1548 n.3 (5th Cir. 1985); <u>Malt v. Union Carbide Chemicals & Plastics Co</u>., 992 F Supp. 286, 300 (S.D.N.Y. 1998); <u>In re The Heritage Organization, Inc.</u>., 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009). With respect to an avoidance claim under section 544(b), however, the state of formation does not dictate the law applicable to a trustee's claims. <u>In re The Heritage Organization, L.L.C</u>., 413 B.R. at 463 ("internal affairs" doctrine does not mandate the application of Delaware law to the trustee's fraudulent transfer claims); <u>see</u> <u>also</u> <u>In re Allserve Systems Corp</u>., 379 B.R. 69, 79-80 (Bankr. D. N.J. 2007); <u>Drenis v. Haliqiannis</u>, 452 F.Supp. 2d 418, 425-28 (S.D.N.Y. 2006). Considering all of the contacts reflected in the Trustee's Complaint as a whole, the court concludes that Louisiana law applies to the Trustee's claims under section 544(b). The principal place of business of the debtor entities is Louisiana and the transfers challenged by the Trustee are centered in Louisiana. For example, the payments under the CSA and the PSA purportedly involve services provided in connection with Gulf Fleet's Louisiana-based operations. Similarly, the transactions involving the construction of the *M/V*

-21-

*Gulf Tiger* by Thoma-Sea Shipbuilders, LLC involve Louisiana-based construction activities. (<u>See</u> Complaint at ¶ 50). In contrast, the Complaint reveals no other contacts to Delaware other than the fact that Delaware is the state of formation for the Gulf Fleet entities.[2] Because Louisiana law applies, the Trustee's section 544(b) claim is limited to transfers made within three years of the bankruptcy.

### 3. The Professional Services Agreement and Consulting Agreement.

The Trustee first challenges the PSA and the CSA as well as the payments made pursuant to the agreements. The H.I.G. Defendants contend that both of these agreements were executed more than three years prior to bankruptcy and, therefore, are not subject to avoidance under Louisiana Civil Code article 2036. According to the Complaint, these agreements were executed at the time of the May 1, 2007 LBO, which is more than three years prior to the filing of Gulf

---

[2]Defendant H.I.G. Capital and certain of its affiliates are based in Miami, Florida. (Complaint at ¶¶ 9-10). No party has addressed whether Florida law applies to the Trustee's claims, nor does the Complaint assert a section 544(b) claim based on Florida law. As a result, the court will not perform a separate choice-of-law analysis with respect to Florida law. The court, however, notes that the relationship between H.I.G. and Gulf Fleet, as pled in the Complaint, was centered on Gulf Fleet's operations and principal place of business in Louisiana. Accordingly, even if the Complaint relied on Florida law, the court would still conclude that Louisiana law defines the Trustee's rights under section 544(b).

-22-

Fleet's bankruptcy petition on May 14, 2010. As a result, these agreements cannot be avoided under article 2036. They also cannot be avoided under section 548 because that provision only reaches transfers occurring within the two-year period prior to bankruptcy.

The Trustee alternatively argues that even if these two agreements are not avoidable, the individual payments made pursuant to the agreement occurred within the three-year period prior to bankruptcy and can be avoided under article 2036. Specifically, the Complaint identifies the following management fees paid by Gulf Fleet pursuant to the agreements totaling $1 million:

| | |
|---|---|
| 09/05/2007 | $125,000 |
| 10/04/2007 | 125,000 |
| 02/28/2008 | 125,000 |
| 08/08/2008 | 250,000 |
| 10/03/2008 | 125,000 |
| 01/05/2009 | 125,000 |
| 04/01/2009 | 125,000 |

(Complaint at ¶ 81). The Complaint also alleges that Gulf Fleet paid over $500,000 in expense reimbursements pursuant to the CSA from June 18, 2007 through June 21, 2010.[3] The Trustee's argument with

---

[3] The Complaint identifies a $419,000 payment on May 2, 2007, but this payment falls outside the three-year avoidance period. For purposes of section 548, the reachback period would cover the payments made during the two years prior to the filing.

-23-

respect to avoiding these payments as constructive fraudulent
transfers runs into the immediate problem that the payments were
made to satisfy an antecedent debt — the contractual obligations
imposed by the CSA and PSA. By definition, Gulf Fleet received
reasonably equivalent value from the satisfaction of its contractual
obligations under these agreements. 11 U.S.C. § 548(d)(2)(A)
(defining "value" to include the "satisfaction or securing of a
present or antecedent debt of the debtor.") Given the definition of
value in section 548, courts have uniformly held that such payments
are not avoidable as constructively fraudulent transfers. See,
e.g., In re Southeast Waffles, LLC, 702 F.3d 850 (6th Cir. 2012) ("A
dollar-for-dollar reduction in debt constitutes - as a matter of law
- reasonably equivalent value...."); In re Sharp Intern. Corp.,403
F.3d 43 (2d Cir. 2005) (conveyance that satisfies an antecedent debt
is not a fraudulent conveyance); In re Elrod Holdings Corp., 421
B.R. 700 (Bankr. D. Del. 2010); In re IFS Financial Corp., 417 B.R.
419, 441-42 (Bankr. S.D. Tex. 2009) (under relevant fraudulent
conveyance law, "value" includes satisfaction of an antecedent
debt); In re Central Ill. Energy Co-op v. Camile's of Canton, Inc.,
2011 WL 3666611 at * 4 (Bank. C.D. Ill. Aug. 22, 2011) (debtor's
payment toward contractual obligations "discharged that liability
and could not have been fraudulent...."). Here, the PSA and CSA

-24-

defined and fixed Gulf Fleet's obligation to pay specific lump sum management fees of approximately $500,000 per year as well as other fees, expense reimbursements, and commissions. (Complaint at ¶ 33). As a result, the Trustee cannot avoid these individual payments as constructive fraudulent transfers under section 548 based on the facts pled in the Complaint.[4]

Nor can these allegations support a claim under section 544 based on Louisiana law. A revocatory action under Civil Code article 2036 requires that the Trustee plead and prove that the payments at issue "caused" or "increased" Gulf Fleet's insolvency. La. Civ. Code art. 2036. While the Complaint alleges that Gulf Fleet was insolvent at the time of these payments, it does not plead facts showing that the payments increased insolvency. Rather, on its face, the Complaint merely shows payments in satisfaction of an antecedent debt which, by definition, would not have increased Gulf Fleet's insolvency.

---

[4] There is an argument that the individual payments made pursuant to the CSA and PSA are not "severable" from the underlying agreements for statute of limitations purposes and, therefore, that the individual payments are also barred by limitations. See In re Café Creme, Ltd., 244 B.R. 221, 238 (Bankr. S.D.N.Y. 2000). The court need not address this question because, even if this limitations argument does not come into play, the payments in the present case are payments that satisfy an antecedent debt, and thus are not avoidable based on the facts pled in the Complaint. See In re Trinsum Group, Inc., 460 B.R. 379, 391 n.9 (Bankr. S.D.N.Y. 2011) (regardless of whether payments are severable for limitations purposes, they are unavoidable payments of an antecedent debt).

-25-

The Trustee also asserts a claim for "actual" fraud under section 548(a)(1)(A) on the grounds that the transfers were made with the "actual intent to hinder, delay, or defraud" Gulf Fleet's creditors.  Rule 9(b)'s heightened pleading requirements apply to fraudulent transfer claims grounded on allegations of actual fraud. In re American International Petroleum, 402 B.R. 728, 738 (Bankr. W.D. La. 2008).  Under Rule 9(b), a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent."  In re Musicland Holding Corp., 398 B.R. 761, 773 (Bankr. S.D.N.Y. 2008); In re Drier LLP, 452 B.R. 391, 408 (Bankr. S.D.N.Y. 2011).  A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  In re Drier, 452 B.R. at 408.  Moreover, Rule 9(b) generally precludes "group pleading" because "each defendant is entitled to know what he is accused of doing."  In re Alpha Star Ins. Group, Ltd., 383 B.R. 231, 257-58 (Bankr. S.D.N.Y. 2008).

A plaintiff may establish the fraudulent intent required under section 548(a)(1)(A) by pleading so-called "badges of fraud" as circumstantial evidence of fraudulent intent.  These badges of fraud include:

> (1)  the lack or inadequacy of consideration;

-26-

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

` (4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

See In re Soza, 542 F.3d 1060, 1067 (5th Cir. 2008). No particular "badge" is dispositive, and courts typically require the confluence of multiple badges to establish fraudulent intent. In re Equipment Acq. Resources, Inc.., 481 B.R. 422, 431 (Bankr. N.D. Ill. 2012) ("A single badge of fraud is insufficient to establish intent, but the presence of several may create a presumption that the debts acted with the requisite intent to defraud."). The Trustee's allegations must still comply with Rule 9(b) and plead specific facts showing the circumstances constituting fraud. See In re Sharp Intern Corp., 403 F.3d 43, 56, (2d Cir. 2005); In re Charms Holding Co., Inc., 2010 WL 2774852 at * 3-4 (Bankr. D. Del. July 14, 2010).

Here, the Trustee has pled facts showing that the transfers were made to an insider and that Gulf Fleet was insolvent before and

-27-

after the transfers, but pleads no facts (as opposed to conclusions) explaining how these transfers, which satisfied an antecedent debt, could have impacted Gulf Fleet's solvency. With respect to "lack or inadequacy of consideration," these payments were made to satisfy antecedent debts and, as explained above, resulted in the receipt of reasonably equivalent value by definition. See 11 U.S.C. § 548(d)(2)(A). The Trustee also has not pled facts showing that Gulf Fleet retained "possession, benefit or use" of the funds paid pursuant to the CSA and the PSA. Nor does the Complaint include facts showing that the transfers resulted from a course of conduct undertaken after Gulf Fleet incurred debt, began to encounter financial difficulties, or after the threat of lawsuits. To the contrary, the timing of the payments from 2007 to 2009 appears consistent with the yearly payment obligations of the CSA and PSA as opposed to the financial condition of Gulf Fleet. There also are no allegations of threatened litigation at the time of the challenged transfers. Finally, the general chronology of the payments is more consistent with a debtor attempting to comply with its contractual obligations than attempting to delay, hinder, or defraud creditors. See In re Marketxt Holding Corp., 361 B.R. 369, 396 (Bankr. S.D.N.Y. 2007) (payment pursuant to pre-existing obligation is not a *prima facie* scheme to hinder or delay other creditors). In sum, the Trustee has not met the burden required

-28-

under Rule 9(b) to plead actual fraud in connection with the transfers pursuant to the CSA and the PSA. The court, however, will grant the Trustee leave to re-plead his section 544 and section 548 claims in order to allege any additional facts showing that, despite Gulf Fleet's pre-existing contractual obligations, Gulf Fleet did not receive reasonably equivalent value for the payments.[5]

---

[5]Some courts relax the heightened pleading requirements of Rule 9(b) for allegations of fraud pled by bankruptcy trustees. See In re Marketxt Holdings Corp., 361 B.R. at 385 (relaxing pleading requirements for trustees because "a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.") (citing In re Park South Securities, LLC, 326 B.R. 505, 517-18 (S.D. N.Y. 2005)). At least one court in the Fifth Circuit, however, has declined to relax the requirements of Rule 9(b) for bankruptcy trustees. See In re NE 40 Partners, Ltd. Partnership, 440 B.R. 124, 128-29 (Bankr. S.D. Tex. 2010). In the NE 40 Partners case, the court observed that the Fifth Circuit has taken a strict view of the pleading requirements of Rule 9(b). The court also noted that the relaxed view of Rule 9(b) in the bankruptcy context originated in cases decided before Iqbal and Twombly. The court need not decide this question because the Trustee has not satisfied even the liberal standard applicable to trustees. Even in cases where courts applied a more liberal Rule 9(b) standard, a trustee must plead facts, not conclusions, showing the circumstances of the defendants' alleged fraudulent conduct. While the judicial gloss on Rule 9(b) - such as the Second Circuit's pre-PSLRA "strong inference of fraudulent intent" standard under Rule 9(b) - may be subject to relaxation, Rule 9(b) does not distinguish among different classes of plaintiffs in imposing a heightened pleading standards. See, e.g., In re Opus East, LLC, 480 B.R. 561, 573 (Bankr. D. Del. 2012) (even under a relaxed Rule 9(b) pleading standard, the trustee failed to "allege who made a statement, where and when the statement was made, or provide the context in which the statement was made").

### 4. Expenditures in Connection with the *M/V Gulf Tiger*.

The Trustee further challenges certain expenditures made by Gulf Fleet in connection with the construction of the *M/V Gulf Tiger*. The Trustee contends that GF Tiger Acquisition and H.I.G. required Gulf Fleet to continue committing equipment, funds, materials, and labor to Thoma-Sea for the construction of the vessel even though Gulf Fleet had no contractual obligation to fund the completion of the vessel after the contract was assigned. (Complaint at ¶ 52). According to the Trustee, "Zanarini promised [Gulf Fleet's CEO] that H.I.G. and/or H.I.G. Subsidiaries would repay Gulf Fleet for the expenditures." (Id.) The Trustee alleges that Zanarini "made this promise either knowing it was false or with reckless disregard to its falsity, expecting Gulf Fleet to rely on it." (Id.). The H.I.G. Defendants respond that Gulf Fleet did receive reasonably equivalent value for these expenditures because it was paid $8 million for its rights under the construction contract when it had only paid a $4 million deposit on the contract before the assignment. (H.I.G. Memorandum in Support of Motion to Dismiss at 6). Thus, even with $1 million of post-assignment expenditures, Gulf Fleet still had a $3 million net profit on the transaction according to the H.I.G. Defendants. The defendants also point to an option agreement that is not cited in the Complaint, and argue that this agreement purportedly gave Gulf Fleet an absolute

-30-

right to purchase the completed vessel from GF Tiger Acquisition merely by refunding the $8 million it received for the assignment. Finally, the moving defendants contend that the Trustee's claim fails because "the Trustee's allegations plainly show that any transfer was made to Thoma-Sea, not GF Tiger Acquisition." (<u>Id</u>.).

The H.I.G. Defendants' argument that the Trustee's claim should be dismissed because Thoma-Sea received the transfer and not GF Tiger Acquisition fails based on the language of section 550(a)(1). This provision provides that "the trustee may recover, for the benefit of the estate the property transferred, or, if the court so orders, the **value of such property**, from -- the initial transferee of such transfer **or the entity for whose benefit such transfer was made**...." 11 U.S.C. Section 550(a)(1) (emphasis added). Assuming that Gulf Fleet continued to contribute equipment, funds, labor, and other resources to Thoma-Sea, these transfers were for the benefit of GF Tiger Acquisition as the owner of the construction contract. Accordingly, under section 550(a)(1), the Trustee may seek to recover "the value of such property" from GF Tiger Acquisition as the beneficiary of the transfer.

Moreover, the Trustee has adequately pled that Gulf Fleet did not receive reasonably equivalent value from these expenditures. The Trustee alleges that nothing in the assignment documents obligated Gulf Fleet to contribute additional equipment and labor

-31-

to a project that would benefit GF Tiger Acquisition even though Gulf Fleet had locked into a substantial profit on the assignment. The assignment and the subsequent contributions to the construction contract must be viewed as separate transactions absent allegations of fact showing that the later contributions were made pursuant to the assignment agreement or facts that would support collapsing the transactions. Finally, the option agreement cited by the moving defendants may ultimately support their claim that Gulf Fleet received reasonably equivalent value if the option agreement and assignment agreement are considered together. However, this is a question that involves matters outside the pleadings and cannot be considered on a Rule 12(b)(6) motion to dismiss. <u>Cause v. Sewell Cadillac-Chevrolet, Inc</u>., 394 F.3d 285, 288 (5th Cir. 2004). In sum, the Trustee has pled facts with respect to the *M/V Gulf Tiger* expenditures that, accepted as true, state "a claim that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570; <u>Bowlby v. City of Aberdeen, Miss</u>., 681 F.3d 215, 227 (5th Cir. 2012).

**5. Repayment of $4 Million Loan.**

The Trustee further challenges the repayment of Michael Hillman's $4 million loan as a fraudulent transfer. These allegations suffer from the same problem as the allegations involving the PSA and the CSA: it is apparently a payment that satisfies an antecedent debt and is not avoidable under section 548

-32-

or Louisiana law based on the facts pled in the Complaint. T h e Trustee, however, argues that the payment to H.I.G. and Hillman was not merely the repayment of an antecedent debt, but converted an unsecured loan to an insider into a secured obligation. Specifically, the Trustee argues that the $4 million loan was repaid with the proceeds from a secured loan by LBC Credit Partners, and that the satisfaction of Hillman's unsecured obligation was not reasonably equivalent in value to the corresponding increase in Gulf Fleet's secured debt. (Complaint at ¶¶ 46, 35 n. 5). Courts have generally rejected the use of a "fixed mathematical formula to determine reasonable equivalence." Peltz v. Hatten, 279 B.R. 710, 736 (D. Del. 2002). Instead, courts have employed a two-step inquiry for assessing whether a debtor received reasonably equivalent value. See, e.g., ASARCO, LLC v. Americas Min. Corp., 382 B.R. 49, 65 (S.D. Tex. 2007); In re WRT Energy Corp., 282 B.R. 343 (Bankr. W.D. La. 2001); see also In re Fruehauf Trailer Corp., 444 F.3d 203, 212 (3d Cir. 2006). Under this approach, the court must first consider whether the debtor received any value from the transaction. ASARCO, LLC, 382 B.R. at 65; Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M .L., Inc.), 92 F.3d 139, 144 (3d Cir. 1996). If the court concludes that the debtor received value, the court then compares the value received and the transfer to determine "whether the debtor got roughly the value it

-33-

gave." <u>In re Fruehauf Trailer Corp.</u>, 444 F.3d at 212–13 (citations omitted). To assess the reasonable equivalence of the transfer or obligation and the value received by the debtor, a court should look to the "totality of the circumstances" surrounding the transaction. <u>Id</u>. at 213 (quoting <u>In re R.M .L., Inc.</u>, 92 F.3d at 148–49, 153). While this inquiry is inherently factual and is not ordinarily a proper inquiry for a motion to dismiss, the Trustee must plead more than a mere conclusion that Gulf Fleet failed to receive reasonably equivalent value from the transaction.

Here, the Trustee's argument on the conversion of unsecured debt into secured debt suffers from at least two flaws. First, the Trustee does not plead sufficient facts to support his conclusion that Gulf Fleet did not receive reasonably equivalent value from the satisfaction of the $4 million loan. The allegations in the complaint with respect to the secured loan used to pay the $4 million loan are "bare bones", and provide no details about the relationship between the secured loan and the repayment of the $4 million note, the nature of the collateral that secured the loan, or the value of the collateral. <u>See</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009) (noting that "it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.") Indeed, the Complaint only identifies the secured lender in a brief footnote to paragraph 35 of the Complaint.

-34-

Absent these details, the Trustee cannot state a plausible claim that Gulf Fleet failed to receive reasonably equivalent value for a payment that discharged an antecedent debt. At most, the Trustee alleges that the unsecured note was replaced with a secured loan. Courts have held that a transfer that results in a new security interest – in other words, the conversion of an unsecured loan to a secured loan – is not by itself sufficient to support a finding that the debtor did not receive reasonably equivalent value. <u>See In re Marketxt</u>, 361 B.R. at 398 ("The cases are uniform that the grant of collateral for a legitimate antecedent debt is not, without more, a constructive fraudulent conveyance.").

Second, the repayment of the loan to Hillman and the secured loan with LBC Credit were two distinct transactions involving two distinct creditors. In comparing the value received with the value transferred, courts generally limit their inquiry to the specific transaction that the plaintiff seeks to avoid. However, where there are multiple related transactions, courts will sometimes "collapse" the transactions and consider the transactions as one integrated transaction for purposes of assessing whether the debtor received reasonably equivalent value. <u>United States v. Tabor Court Realty Corp.</u>, 803 F.2d 1288, 1301–03 (3d Cir. 1986), <u>cert</u>. <u>denied</u>, 483 U.S. 1005 (1987). <u>See also</u> <u>Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.</u>, 919 F.2d 206, 212–13 (3d Cir. 1990); <u>HBE Leasing Corp.</u>

-35-

v. Frank, 48 F.3d 623, 635-36 (2d Cir. 1995); In re Old CarCo LLC, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) (quoting In re Sunbeam Corp., 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) ("The collapsing concept is usually applied when a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the 'formal structure erected and labels attached' make them appear distinct.")). Whether multiple distinct transactions should be "collapsed" and viewed as a single integrated transaction turns on the substance rather than the form of the transactions, and courts consider the overall intent and impact of the transactions. See, e.g., Liquidation Trust v. Preferred Bank (In re Syntax-Brillian Corp.), 2011 WL 3101809 at * 11 (Bankr. D. Del. July 25, 2011) ("Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors.") (citations omitted). In other words, courts focus "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." In re Hechinger Inv. Co. of Del., 274 B.R. 71, 91 (D. Del. 2002). Factors that courts have considered in deciding whether or not to collapse multiple transactions include (1)whether all parties involved in the individual transactions had knowledge of the other transactions, (2) whether each transaction would have occurred on its own, and (3) whether each transaction was dependent or conditioned on the other

-36-

transactions. <u>In re Mervyn's Holdings, LLC</u>, 426 B.R. 488, 497 (Bankr. D. Del. 2010); <u>In re Jevic Holding Corp.</u>, 2011 WL 4345204 at *5 (Bankr. D. Del. Sept. 15, 2011); <u>In re Syntax-Brillian Corp.</u>, 2011 WL 3101809 (Bankr. D. Del. July 25, 2011). In the <u>Syntax-Brillian Corp.</u> case, the court concluded that the plaintiff did not plead grounds to collapse multiple transactions as part of its constructive fraudulent transfer claim. 2011 WL 3101809 at * 10-11. Here, the Trustee's allegations regarding the repayment of the $4 million loan and the LBC Credit secured loan similary do not support collapsing the two transactions because the allegations do not address the factors germane to whether these two transactions should be viewed as a single integrated transaction. <u>See</u> <u>Mervyn's Holdings, LLC</u>, 426 B.R. at 497; <u>Syntax-Brillian Corp.</u>, 2011 WL 3101809 at *10-11. Accordingly, the court concludes that the Trustee has not stated a constructive fraudulent transfer claim under section 548 or Louisiana law with respect to the $4 million payment to Hillman.

The court further concludes that the Trustee has not stated a claim for actual fraud under section 548 for the same reasons outlined with respect to the payments made under the CSA and the PSA. The court, however, will grant the Trustee leave to re-plead his section 544 and section 548 claims in order to plead any additional facts showing that the repayment of the $4 million loan

-37-

and the secured loan by LBC Credit should be collapsed, and that Gulf Fleet did not receive reasonably equivalent value when the two transactions are evaluated as a single integrated transaction.

**6.  The $2.9 million GF Financing Promissory Note.**

The H.I.G. Defendants next challenge the Trustee's fraudulent transfer claim based on the $2.9 million GF Financing promissory note.  The Trustee alleges that Gulf Fleet entered into this promissory note to replace its obligations under the Factoring Agreement when that agreement had to be modified because of objections by Comerica Bank.  According to the Trustee, the original Factoring Agreement was non-recourse and Gulf Fleet had no obligation to enter into the promissory note to replace its obligations under the Factoring Agreement. (Complaint at ¶ 62). Moreover, the Trustee alleges that the promissory note imposed obligations on other affiliated Gulf Fleet entities that were not liable under the original Factoring Agreement. (<u>Id</u>. at 80). The court agrees with the Trustee that these allegations, taken as true, are sufficient to withstand dismissal under <u>Iqbal</u> and <u>Twombly</u>.  <u>See In re TOUSA, Inc</u>., 422 B.R. 783 (Bankr. S. D. Fla.), <u>aff'd</u> 680 F. 3d 1298 (11th Cir. 2012).[6]  Accordingly, the H.I.G. Defendants'

---

[6]TOUSA and its subsidiaries designed, built and marketed residential real estate developments.  422 B.R. at 787.  TOUSA became enmeshed in litigation over a failed joint venture.  TOUSA ultimately settled this litigation and took out a new loan to

-38-

Motion to Dismiss is denied with respect to the Trustee's constructive fraudulent transfer claims based on the $2.9 million GF Financing promissory note.

With respect to the Trustee's section 548 claim based on actual fraud, the court concludes that the Trustee has not stated a claim for actual fraud based on the $2.9 million GF Financing note for the same reasons outlined with respect to the payments made under the CSA and the PSA. The court, however, will grant the Trustee leave to re-plead his section 548 claim to the extent that it is based on actual fraud.

## C. Counts 2 and 3: Recharacterization and Simulation

Count 2 of the Complaint addresses the Trustee's claim that the $2.9 million and $5.5 million promissory notes and H.I.G.'s contract claims under the CSA and PSA should be recharacterized as equity contributions under 11 U.S.C. § 105 and Louisiana Civil Code articles 2025-2027. A "recharacterization" action challenges a claim characterized as debt and requests that the court treat that debt as an equity investment. In re AutoStyle Plastics, Inc., 269

---

fund the settlement. Id. Even though certain of its subsidiaries (later debtors in bankruptcy) had no liability with respect to that litigation, these subsidiaries granted security interests in their assets to secure the new loan. Id. The court held that these subsidiaries received "no direct value" and "minimal indirect benefits" from the transaction and, therefore, concluded that there were grounds to avoid the grant of security interests as fraudulent transfers. Id. at 866-67.

F.3d 726, 749 (6th Cir. 2001); <u>In re Insilco Technologies, Inc</u>., 480 F.3d 212, 217 (3d Cir. 2007). Courts generally base their power to recharacterize debt as equity on the bankruptcy court's equitable powers under 11 U.S.C. § 105. Recharacterization fundamentally alters a creditor's rights in bankruptcy because, as one court has explained, creditors "present their claims to the court by filing a proof of claim, whereas equity security holders assert their rights to distribution of the proceeds of a solvent corporate debtor by filing a proof of interest." <u>In re AVN Corp</u>., 235 B.R. 417, 423 (Bankr. W.D. Tenn. 1999). If a creditor's claim is successfully recharacterized as an equity investment under section 105, the creditor is essentially relegated to the end of the line with other equity holders. <u>Id</u>. The Fifth Circuit, however, recently changed the landscape of recharacterization actions in <u>In re Lothian Oil, Inc</u>., 650 F.3d 539 (5th Cir. 2011). In the <u>Lothian Oil</u> case, the court rejected the use of section 105 to recharacterize debt as equity. As the Trustee correctly notes, however, the Fifth Circuit did not abrogate a court's ability to recharacterize debt as equity, but instead reorientated the underpinnings of the doctrine from section 105 to the claims allowance process under 11 U.S.C. § 502(b). Specifically, section 502(b)(1) provides that a claim is disallowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." 11 U.S.C.

-40-

§ 502(b)(1). The <u>Lothian Oil</u> panel explained that the "applicable law" referenced in section 502(b)(1) is state law. 650 F.3d at 543. A claim based on a debt may, therefore, be disallowed under section 502(b)(1) and instead treated as an equity interest if applicable state law provides grounds for recharacterizing the debt as an equity contribution. <u>Id</u>. at 543-44.

<u>Lothian Oil</u> precludes Count 2 of the Complaint to the extent that it is based on federal recharacterization principles that rely on the court's equitable powers under section 105. If the Trustee has a viable recharacterization claim, that claim must be based on state law. The Trustee cites Louisiana law on simulations in Counts 2 and 3 of the Complaint.[7] Count 3 asserts simulation as a separate, stand-alone claim for relief. Under Louisiana law, a "simulation" is a contract which "by mutual agreement...does not express the true intent of the parties." La. Civ. Code art. 2025. An "absolute simulation" occurs where the parties intend that the contract shall have no effect between them. La. Civ. Code art. 2026. In contrast, a "relative simulation" occurs where the intended effects of the contract differ from the terms expressed in

---

[7]The same factors that support the application of Louisiana law to the Trustee's section 544(b) claims also supports the Trustee's reliance on Louisiana law in Counts 2 and 3 of the Complaint. Specifically, the transactions that are challenged in Counts 2 and 3 were centered in Louisiana, and Louisiana has the most substantial relationship to these claims.

-41-

the contract.  La. Civ. Code art. 2027; <u>Bennett v. Porter</u>, 58 S.3d 663, 671 (La. App. 3d Cir. 2011).  A relative simulation thus requires proof of the parties' mutual intent as well as proof that "all the requirements for those effects [intended by the parties] have been met." <u>Bennett</u>, 58 S.3d at 671.  Most of the cases where courts have found that a contract was a relative simulation fall into two distinct fact patterns: (1) cases where the parties structured the contract to appear as a true sale but intended the transaction to be a donation; or (2) cases where the parties structured the contract as a true sale with a right of redemption, but intended the transaction to be a secured loan.  <u>See</u>, <u>e.g.</u>, <u>Miller v. Jackson</u>, 80 So.2d 673, 681 (La. App. 3d Cir. 2011) (parties intended contract providing for sale of property with right of redemption to be a secured loan); <u>Bennett</u>, 58 So.3d at 671 (parties intended purported sale to be a donation).

The H.I.G. Defendants contend that the Trustee cannot rely on Civil Code articles 2025-2027 to support a recharacterization claim or an independent claim for simulation because the Complaint concedes that some consideration was exchanged in the transactions challenged in Counts 2 and 3.  According to the H.I.G. Defendants, an exchange of any consideration defeats a simulation claim as a matter of law. (H.I.G. Defendants' Memorandum In Support of Motion to Dismiss at 10).  The court disagrees.  The cases where courts

-42-

have held that an exchange of consideration defeats a simulation claim primarily involve cases where the parties intend that the contracts should have no effect (an absolute simulation), or cases where the parties intended their transaction to be a donation.  See, e.g., Bennett, 58 So.3d at 671-72 (holding that "the crucial factors in a determination of whether a transaction is a sale or a simulated donation...parties is whether consideration was given."); Johnson v. Unopened Succession of Alfred Covington, Jr., 969 So.2d 733, 741 (La. App. 2nd Cir. 2007) (rejecting argument that sale was absolutely null on the grounds that it was a simulation because some consideration was exchanged which established "the reality of the transference."); Pounds v. Yancy, 224 So.2d 1, 5 (La. App. 1st Cir. 1969) (exchange of any consideration defeated argument that contract should be set aside as an absolute simulation);[8]  Waterbury v. Waterbury, 496 So.2d 1374 (La. App. at 3rd Cir. 1986) (same).  This limitation cannot, however, extend to all cases involving relative simulations without running afoul of the line of cases holding that

---

[8]The Pounds case, like the Johnson case, did not expressly identify the contract at issue as an absolute simulation, but the fact that both courts framed the question as whether the contract could be set aside as an absolute nullity is consistent with a claim that the contract was an absolute simulation – in other words, that the contract is given no effect because the parties intended that the contract would have no effect.  See, e.g., Pounds, 224 So.2d at 5 (stating that a "simulated transaction is one declared to be feigned or pretended" and that it "has, in effect, no existence.")

-43-

sales with redemption rights may be recharacterized as secured loans. See, e.g., Miller, 80 So.3d at 681. In these cases, as in the present case, the courts treated the contracts as relative simulations and enforced the effects intended by the parties even though some consideration was apparently exchanged. Although the parties have not cited – nor has the court located – any Louisiana case law relying on Civil Code articles 2025-2027 to recharacterize debt as equity, the court agrees with the Trustee that these Civil Code provisions could support a recharacterization claim under Lothian Oil and section 502(b)(1). The court, however, also concludes that the allegations supporting Counts 2 and 3 do not allege the elements necessary to establish that the $2.9 million and $5.5 million promissory notes and H.I.G.'s contract rights under the CSA and the PSA are relative simulations and should be recharacterized as equity contributions to Gulf Fleet. Specifically, the Trustee must first plead and prove that the parties on both sides of the transactions intended that the transactions be treated as equity contributions and not debts. In Count 3, the Trustee generally pleads in a conclusory manner that both Gulf Fleet and H.I.G. intended the loans to be equity contributions and that they should, therefore, be recharacterized as equity under Civil Code articles 2025-2027. In Count 2, however, the Trustee alleges that H.I.G. structured the promissory notes so

-44-

that they could be converted into equity if Gulf Fleet prospered, but they would be treated as debt if Gulf Fleet failed. (Complaint at ¶ 97). Although these allegations may support a pre-<u>Lothian Oil</u> claim for equitable recharacterization under section 105, the acknowledgment that H.I.G. intended to be treated as a creditor under the promissory notes absent an affirmative act to convert the notes to equity negates an essential element of the Trustee's simulation claim under Civil Code articles 2025-2027: that H.I.G. and Gulf Fleet mutually intended that that funds provided pursuant to the $2.9 million and $5.5 million promissory notes were to be treated solely as equity contributions.

With respect to H.I.G.'s contract claims under the CSA and PSA, it is not clear what the Trustee is seeking to recharacterize under articles 2025-2027. According to the allegations in the Complaint, H.I.G. agreed to provide certain services pursuant to the agreements in exchange for the payment of regular management fees, commissions, and expense reimbursements. If the Trustee is arguing that the services provided pursuant to these agreements were intended to be equity contributions, the fact that Gulf Fleet made a number of payments to H.I.G. under those agreements seems to refute the theory that both parties intended the services to be equity contributions.[9]

---

[9]The court also notes that this theory is inconsistent with the Trustee's allegation that H.I.G. provided no services to Gulf Fleet under the terms of the CSA and the PSA.

-45-

If the Trustee is referring to the individual payments made pursuant to the agreements, all of these payments were made by Gulf Fleet to H.I.G. and thus cannot be characterized as equity contributions to Gulf Fleet.

Second, in order to maintain a recharacterization claim based on Civil Code articles 2025-2027, the Trustee must establish that all of the prerequisites for the effects that parties actually intended have been satisfied. <u>Bennett</u>, 58 S.3d at 671. For example, where a purported sale is intended to be a donation, the transaction must satisfy the requirements for a donation under the Civil Code. <u>See</u> <u>Tate v. Tate</u>, 42 S.3d 439, 442-43 (La. App. 1st Cir. 2010) (relative simulation "will only constitute a valid donation if all the requirements for a donation have been satisfied."). Here, treatment of the promissory notes as equity contributions would have to be consistent with the law under which the applicable Gulf Fleet entity was organized, the applicable formation documents and, in the case of entities organized as an LLC, the applicable LLC agreements. The Complaint simply does not address whether the $2.9 million and $5.5 million promissory notes can be treated as an equity contribution under the relevant law of the state of formation or each entity's governing agreements. Because these pleading defects may be curable, the court will grant

-46-

the Trustee leave to re-plead its recharacterization and simulation claims under Counts 2 and 3 of the Complaint.

## D. Count 4:  Subordination

In Count 4 of the Complaint, the Trustee contends that any claims under the CSA and PSA, the Brightpoint note, the $5.5 million promissory note, the $2.9 million GF Financing promissory note, and H.I.G.'s contract claims should be equitably subordinated under 11 U.S.C. §§ 510(b) and 510(c).  According to the Trustee, H.I.G. dominated Gulf Fleet and breached its fiduciary duties to Gulf Fleet by requiring Gulf Fleet to enter into transactions that solely benefitted H.I.G. (Complaint at ¶ 105).  The Trustee contends that this inequitable conduct by H.I.G. supports the subordination of its claim.  The H.I.G. Defendants contend that these allegations are insufficient because they fail to include specific facts that show inequitable conduct by H.I.G. that resulted in damage to Gulf Fleet's creditors. (H.I.G.'s Memorandum in Support of Motion to Dismiss at 18).  A claim for equitable subordination requires proof that (1) the claimant was engaged in inequitable conduct; (2) the misconduct must have resulted in injury to creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.  See In re SI Restructuring, Inc., 532 F. 3d 355, 360 (5th Cir. 2008).  Inequitable conduct

-47-

typically exists in three categories of cases: (1) "those in which a fiduciary of the debtor misuses his position to the disadvantage of other creditors"; (2) "those in which a third party, in effect, controls the debtor to the disadvantage of others"; and (3) "those in which a third-party defrauds other creditors." <u>CTS Truss, Inc. v. Fed. Deposit. Ins. Co.</u>, 868 F.2d 146, 148–49 (5th Cir. 1989).

The Trustee's allegations, taken as true, address each of the elements of a section 510(c) claim and fall into one or more of the categories identified by the <u>CTS Truss</u> court. The court is satisfied that these allegations are sufficient to avoid dismissal. Accordingly, the court denies the H.I.G. Defendants' Motion to Dismiss with respect to the Trustee's equitable subordination claim.

**E.  Counts 5 and 6:  Breach of Fiduciary Duty**

The H.I.G. Defendants next challenge the Trustee's breach of fiduciary duty claims in Counts 5 and 6 of the Complaint.  The Trustee alleges that H.I.G. and H.I.G.'s affiliates owed fiduciary duties to all of the Gulf Fleet entities,  and that they breached those duties following the LBO in May 2007.  The Trustee also alleges that the individual defendants, Mssrs. Tamer, Zanarini, and Fox owed fiduciary duties to the Gulf Fleet entities because they served on Gulf Fleet's board, and that they breached those duties by taking actions that favored H.I.G. at the expense of Gulf Fleet, Gulf Fleet's minority shareholder, and Gulf Fleet's creditors.

-48-

### 1. Choice of Law.

The court must first address choice of law. The Trustee alleges that Louisiana law should govern his fiduciary duty claims because decisions "made about the Gulf Fleet entities were made in Louisiana, about a Louisiana business with operations, assets and personnel in Louisiana." (Complaint at ¶ 108). Under Louisiana choice-of-law rules, "the law of the place where the corporation was incorporated governs disputes regarding the relationship between the officers, directors, and shareholders and the officers' and directors' fiduciary duties." Torch Liquidating Trust Ex Rel. Bridge Associates, LLC v. Stockstill, 561 F.3d 377, 385 n.7 (5th Cir. 2009) Gulf Fleet Holdings, Inc. is a Delaware corporation, and Gulf Fleet Services, LLC and Gulf Wind, LLC are Delaware limited liability companies. Accordingly, Louisiana choice-of-law rules dictate that any fiduciary duty claims with respect to these entities are governed by Delaware law. Louisiana law governs the remaining Gulf Fleet entities that are Louisiana limited liability companies. As the H.I.G. Defendants point out, however, the fiduciary duty claims in Counts 4 and 5 focus on the Delaware entities. Accordingly, the court will apply Delaware law to the Trustee's claims except where any claim relates specifically to a Louisiana entity and applicable Louisiana law differs from Delaware law.

-49-

Under Delaware law, the directors of a Delaware corporation owe fiduciary duties of loyalty and care to the corporation. See Mills Acq. Co. v. MacMillan, Inc., 559 A.2d 1261, 1280 (Del. 1989). These duties require that directors exercise their authority on an informed basis and in the good faith pursuit of maximizing the value of the corporation for the benefit of its stockholders. Ebay Domestic Holdings, Inc. v. Newmark, 16 A.3d 1, 35 (Del. Ch. 2010). A controlling stockholder may owe fiduciary duties to the corporation that it controls as well as any minority, non-controlling stockholders. See Weinberger v. UOP, Inc., 457 A.2d 701, 709-10 (Del. 1983); Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110, 1113-15 (Del. 1994); Cinerama, Inc. v. Technicolor, Inc., 1991 WL 111134, * 19 (Del. Ch. 1991) ("When a shareholder, who achieves power through the ownership of stock, exercises that power by directing the actions of the corporation, he assumes the duties of care and loyalty of a director of a corporation."). With respect to a solvent corporation, a controlling stockholder or director does not typically owe fiduciary duties to the corporation's creditors. A creditor's rights, in this case, are determined by contract. See Trenwick America Litigation Trust v. Ernst & Young, LLP, 906 A.2d 168, 195 n. 75 (Del. Ch. 2006) When a corporation is insolvent, however, the fiduciary duties owed to the corporation are for the benefit of that corporation's creditors

"because the creditors are now the residual claimants" of the corporation. Id. The application of fiduciary duties in the case of a Delaware LLC differs from the application of those duties in the corporate context in that Delaware's LLC Act provides that an LLC agreement may modify or even eliminate the fiduciary duties of an LLC's managers. See Delaware LLC Act § 18-1101(c). If an entity's LLC agreement is silent as to those duties, Delaware courts will generally default to the fiduciary duties applicable to a corporation. Flight Options Int'l, Inc. v. Flight Options, LLC, NO. 1459-N, Slip Op. at 17, n28 (Del. Ch. Sept. 20, 2005); In re CLK Energy Partners, LLC, 2010 WL 1930065 at * 8 (Bankr. W.D. La. 2010).

### 2. The Trustee's Allegations.

In Counts 5 and 6, the Trustee alleges that H.I.G., H.I.G.'s subsidiaries, and Mssrs. Tamer, Zanarini and Fox breached their fiduciary duties to Gulf Fleet and its affiliates in the following ways:

- The defendants allegedly acted in bad faith solely in the interest of H.I.G. and not Gulf Fleet;

- the defendants allegedly caused Gulf Fleet to provide over $1 million in equipment, materials and labor to Thoma-Sea for the benefit of GF Tiger Acquisition without any compensation or reimbursement;

- the defendants allegedly caused Gulf Fleet to pay over $500 thousand for legal fees and expenses incurred by H.I.G. in connection with certain business transactions including, but not limited, to H.I.G.'s acquisition of Gulf Fleet;

-51-

- the defendants caused Gulf Fleet to enter into the CSA and the PSA, and both agreements were signed by Mr. Tamer on behalf of both H.I.G. and Gulf Fleet;

- the defendants allegedly caused Gulf Fleet to enter into a receivable assignment, that breached its covenants with its senior lender;

- the defendants required Gulf Fleet to reimburse the expenses of H.I.G.'s employees for travel unrelated to Gulf Fleet's business;

- the defendants caused Gulf Fleet and its subsidiaries to execute the Brightpoint note on terms that did not reflect industry standards;

- the defendants intentionally chose to delay the bankruptcy filing to avoid "unwinding" the LBO;

- the defendants' actions caused Gulf Fleet and its affiliates to lose value and "deepen its solvency during the period after which it was clear that the Debtors should file bankruptcy";

- the defendants required Gulf Fleet and its affiliates to execute the $2.9 million and $5.5 million notes to GF Financing "on terms that no reasonable company would accept";

- the defendants allegedly failed to adhere to corporate formalities, including "requirements for holding board meetings and informing non-H.I.G. directors of corporate decisions and board meetings that occurred"; and

- the defendants allegedly made misrepresentations to Gulf Fleet and minority shareholders of Gulf Fleet regarding the financial condition of Gulf Fleet and for the purpose of obtaining "money from RBS, which caused Mr. Hillman and others to expend time and resources pursuing the RBS recapitalization."

(Complaint at ¶ 111). The Trustee also alleges that at the time of these actions, Gulf Fleet and its affiliates were either insolvent or in the "vicinity or zone of insolvency." (Id. at ¶ 110).

-52-

### 3. Sufficiency of Allegations with Respect to Individual Defendants.

The Trustee alleges sufficient facts to show that Mssrs. Tamer, Zanarini, and Fox owed fiduciary duties to Gulf Fleet Holdings, Inc. by virtue of their membership on Gulf Fleet's board of directors. The Complaint also includes sufficient facts that, if accepted as true, support the Trustee's allegations that Gulf Fleet was insolvent after the May 2007 LBO (Complaint at ¶¶ 42-43, 110). Accordingly, any duties owed by the individual defendants to Gulf Fleet Holdings were for the benefit of Gulf Fleet Holdings' creditors. Trenwick, 906 A.2d 15 195 n.75. The Complaint also alleges that Mssrs. Zanarini, Tamer, and Fox had divided loyalties based on their positions with H.I.G. and their role as Gulf Fleet directors, and that they used their positions as Gulf Fleet directors to advance H.I.G.'s interests with respect to (1) the Factoring Agreements, and (2) the $2.9 million and $5.5 million promissory notes. According to the Trustee, the terms of the Factoring Agreements and the promissory notes favored H.I.G. and its affiliates to the detriment of Gulf Fleet and its creditors. These allegations are sufficient to "plead around the business judgment rule" with respect to the Trustee's duty of care claims. In re BH S&B Holdings LLP, 420 B.R. 112, 146-47 (Bankr. S.D.N.Y. 2009); see also In re Musicland Holding Corp., 398 B.R. 761, 788-89 (Bankr.

-53-

S.D.N.Y. 2008) (fiduciary duty claims based on allegations that officers of parent corporation who sat on the board of subsidiary and took actions that favored the parent to the detriment of the subsidiary were sufficient to survive dismissal).

Nevertheless, the Trustee's fiduciary duty allegations fail to state a fiduciary duty claim against Mssrs. Zanarini, Tamer, and Fox for two reasons. First, with three exceptions, the Complaint refers to Mssrs. Zanarini, Tamer, and Fox collectively as the "H.I.G. Employees" in pleading the Trustee's breach of fiduciary duty claims. The problem with this mode of pleading is that a breach of fiduciary duty "is determined on an individual - rather than a collective - basis." In re Farmland Industries, Inc., 335 B.R. 398, 410 (Bankr. W.D. Mo. 2005) (dismissing claims against individual director where there were no "specific allegations of wrongdoing by" that defendant). The Trustee correctly notes that it may be permissible to plead fiduciary duty claims against certain directors as a group where it is clear from the context of the allegations that the defendants acted collectively. For example, a fiduciary duty claim based on a decision made at a board of directors meeting attended by a group of director defendants may be pled collectively. However, that is not the case here. The Complaint provides little in the way of context that would allow an inference that the actions ascribed to Mssrs. Zanarini, Tamer, and Fox were undertaken

-54-

collectively. Indeed, where the Complaint refers to actions by a specific defendant, they are not the collective actions of all three individual defendants. In the case of the allegations pertaining to alleged misrepresentations about Gulf Fleet's contributions to the construction of the *M/V Gulf Tiger*, only Mr. Zanarini is identified. With respect to the Factoring Agreement, the Complaint identifies actions by Mr. Zanarini and Mr. Fox, but not Mr. Tamer. Moreover, the Complaint refers only to Mr. Tamer signing the CSA and PSA for both H.I.G. and Gulf Fleet. The Trustee's remaining fiduciary duty allegations merely refer to these individual defendants collectively. <u>Mukamal v. Bakes</u>, 383 B.R. 798, 827 (S.D. Fla. 2007) (dismissing breach of fiduciary duty claims because the complaint failed to "allege individual allegations as to each [defendant] from which an assessment can be made under the applicable criteria"). With respect to the allegations pertaining to the *M/V Gulf Tiger*, the Factoring Agreement and the CSA and PSA, the Trustee's allegations are sufficiently particular in that they identify the conduct of specific defendants that gives rise to the Trustee's claims.

Second, the Trustee appears to base his fiduciary duty claims in part on allegations that Mssrs. Zanarini, Tamer, and Fox breached duties to Gulf Fleet Holding's subsidiaries and affiliates. (<u>See</u> Complaint at ¶ 111). While the Complaint states that "H.I.G.

-55-

directed the H.I.G. Subsidiaries to appoint Fox, Zanarini, and Tamer to the boards of directors of various Debtor entities," the Complaint only identifies these defendants as officers or directors of Gulf Fleet Holdings. It is unclear that these facts are sufficient to support the existence of a fiduciary duty with respect to all of the Gulf Fleet entities. In <u>In re USACafes, L.P. Litigation</u>, 600 A.2d 43 (Del. Ch. 1991), the Delaware court of chancery concluded that not only did a corporate general partner owe fiduciary duties to its limited partners, but that the individual directors of the corporate general partner also owed fiduciary duties to the limited partners. Delaware courts, however, have sharply limited the reach of <u>USACafes</u> to situations where the directors of the parent are engaged in personal self-dealing. <u>See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.</u>, 2000 WL 1476663 at * 12 (Del. Ch. 2000). While the Trustee alleges that the individual defendants acted for the benefit of H.I.G., the facts pled in the Complaint do not support a plausible claim that these individual defendants engaged in personal self-dealing.

## 4. Sufficiency of Allegations with Respect to H.I.G. Capital and its Affiliates.

The Trustee's allegations with respect to defendant H.I.G. Capital satisfies the pleading standards adopted in <u>Iqbal</u> and <u>Twombly</u> with respect to whether H.I.G. Capital owed a fiduciary duty

-56-

to Gulf Fleet Holdings. The H.I.G. Defendants argue that it is improper to impose fiduciary duties on H.I.G. Capital because H.I.G. Capital was not the direct parent of Gulf Fleet Holdings. (See H.I.G. Defendants' Reply Memorandum at 7) ("The Trustee has cited no authority for the dangerous proposition that the alleged shareholder (e.g., H.I.G.) of a corporation (e.g., GFA) that holds the shares of another corporation (e.g., GFH) that holds the shares of other corporations (e.g., Gulf Fleet) owes fiduciary duties throughout the entire corporate structure.") Delaware courts, however, have extended the reach of fiduciary duties to include shareholders who control a Delaware corporation through an intermediate affiliate. See In re Prime Media, Inc. Primedia Derivative Litigation, 910 A.2d 248, 251 (Del. Ch. 2006). In Primedia, the Delaware court of chancery found that the investment firm Kohlberg Kravis Roberts controlled the debtor – and therefore owed fiduciary duties to the debtor's minority stockholders – through a "complex structure of intermediate entities." Id.; see also Deutsche v. Cogan, 580 A.2d 100, 102 (Del. Ch. 1990) (not only did corporation's majority stockholder owe duties to the corporation's minority stockholders, but majority stockholder's upstream parent companies also owed fiduciaries duties to the corporation's minority stockholders because those upstream parents "exercised control of the corporation through its intermediate

-57-

subsidiaries".)  Here, the Trustee alleges that H.I.G. controlled Gulf Fleet Holdings through its intermediate subsidiaries even though H.I.G. was not the direct parent of Gulf Fleet Holdings. Accordingly, the Trustee's allegations are sufficient to withstand a challenge under <u>Twombly</u> and <u>Iqbal</u>.

The Trustee's fiduciary duty claims, however, suffer from at least two pleading defects with respect to H.I.G. Capital and its affiliates that require the Trustee to replead his claims.  First, like the allegations pertaining to Mssrs. Zanarini, Tamer, and Fox, the Complaint improperly groups H.I.G. Capital and its related subsidiaries and affiliates for purposes of pleading the Trustee's fiduciary duty claims.  As with the individual defendants, the question of whether a fiduciary duty exists and, if so, whether the duty has been breached must be decided on an individual basis. While the Trustee's allegations may be sufficient to support the existence of a fiduciary duty on the part of H.I.G. Capital, these allegations do not necessarily support an extension of that duty to all of H.I.G. Capital's affiliates, such as Brightpoint.  With respect to Brightpoint, the Complaint merely pleads that Brightpoint made a loan to Gulf Fleet.  Without more, the mere fact that Brightpoint is a subsidiary of H.I.G. Capital and made a loan to Gulf Fleet does not establish that it owed a fiduciary duty to Gulf Fleet Holdings.  The same holds for the other H.I.G. affiliates who

-58-

are merely referenced in the Complaint collectively as "H.I.G. Subsidiaries." While the Trustee argues that these affiliates can be referenced as a group because they acted collectively, there is nothing in the Complaint establishing that every H.I.G. affiliate incorporated in the definition "H.I.G. Subsidiaries" owed a fiduciary relationship to Gulf Fleet Holdings and its subsidiaries, or acted collectively in breaching any such duties. The Trustee suggests that H.I.G. and its affiliates can be grouped together because they operated collectively as a "single business enterprise." These allegations are also the basis for the Trustee's claim in Count 12 of the Complaint. As explained below, the Trustee has not pled grounds to pierce the corporate veil of H.I.G. Capital and each of its subsidiaries. Accordingly, the Trustee cannot rely on the single business enterprise doctrine to escape the requirement that he plead a factual basis for his fiduciary duty claims against each H.I.G. affiliated defendant.

Second, the Complaint alleges that the duties owed by the defendants shifted to creditors when Gulf Fleet entered the "vicinity or zone of insolvency." (Complaint at ¶ 110). As recognized by the Fifth Circuit, Delaware courts have held that *actual* insolvency, not the "vicinity or zone of insolvency" is the determining factor as to whether fiduciary duties owed to the corporation must be exercised for the benefit of creditors. See,

e.g., <u>Torch Liquidating Trust ex rel. Bridge Also. L.L.C. v. Stockstill</u>, 561 F.3d 377, 391 n.16 (5th Cir. 2008); <u>In re SI Restructuring, Inc</u>., 532 F.3d 355, 363-64 (5th Cir. 2008). The Trustee also apparently asserts a claim for liability or damages on a theory of "deepening insolvency." (Complaint at ¶ 114). As the Fifth Circuit has also observed, Delaware courts have rejected "deepening insolvency" as an independent cause of action or as an independent theory of damages. <u>SI Restructuring</u>, 532 F.3d at 363-64.

**F.  Count 7:  Aiding and Abetting Breach of Fiduciary Duty**

In Count 7, the Trustee alleges that H.I.G. and its subsidiaries aided and abetted Mssrs. Tamer, Zanarini, and Fox in breaching their fiduciary duties to Gulf Fleet. To state a claim for aiding and abetting a breach of fiduciary duty under Delaware law, the Trustee must plead "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." <u>Malpiede v. Townson</u>, 780 A.2d 1075, 1096 (Del. 2001). Delaware courts have also limited an aiding and abetting claim to defendants who are not fiduciaries. <u>See Feeley v. NHAOCG, LLC</u>, 2012 WL 6840577 at * 6 (Del. Ch. Nov. 28, 2012).

-60-

The Trustee's aiding and abetting claims suffer from at least two flaws. First, as discussed with respects to Counts 5 and 6, the Trustee has not adequately pled his breach of fiduciary duty claims, which is a prerequisite for asserting an aiding and abetting claim. See Malpiede, 780 A.2d at 1096. Second, a claim for aiding and abetting a breach of fiduciary duty claim, by definition, only applies to non-fiduciaries. As a result of the Trustee's collective mode of pleading his breach of fiduciary duty claims, it is not clear which defendant falls within which category – aiding and abetting liability or primary liability. Since the elements of the claims and defenses may well differ, the defendants are entitled to pleadings that clearly delineate which claim applies to which defendant. Accordingly, the court grants the H.I.G. Defendants' Motion to Dismiss with respect to Count 7, but will grant the Trustee leave to re-plead.

## G. Count 8: Delictual Action for Conversion

In Count 8 of the Complaint, the Trustee asserts a delictual action for conversion based on his allegations that Gulf Fleet (1) contributed approximately $1 million toward the *M/V Gulf Tiger* without reimbursement, (2) paid $500,000 of H.I.G.'s legal fees, (3) executed the $2.9 million promissory note to G.F. Financing when it had no obligation to do so under the Factoring Agreement, and (4)

-61-

paid over $1 million to H.I.G. pursuant to the CSA and PSA and received nothing in return. (Complaint at ¶¶ 126-127). The H.I.G. Defendants counter that the Trustee's conversion claim fails as a matter of law because the payment of money cannot be grounds for a conversion claim. (H.I.G. Defendants' Memorandum in Support of Motion to Dismiss at 13). Because the parties cite Delaware, Louisiana, and Florida law, the court must decide what law applies to the Trustee's conversion claims. The general choice-of-law principles outlined in connection with the Trustee's section 544 claims apply here with a significant exception: the Trustee's state law conversion claims do not implicate important federal policy as in the case of the Trustee's section 544 claims. Accordingly, the court will look to Louisiana choice-of-law rules. See In re Endeaver Highrise, L.P., 432 B.R. 583, 637 (Bankr. S.D. Tex. 2008) (applying forum choice-of-law rules to state law claims). Louisiana Civil Code article 3542 provides that "an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be seriously impaired if its law were not applied to that issue." See also Cambridge Toxicology Group, Inc. v. Exnicios, 495 F.3d 169, 176 (5th Cir. 2007) (applying Louisiana choice-of-law rules). In determining which state's policies would be most seriously impaired, article 3542 directs courts to evaluate "the strength and pertinence of the relevant policies of the

-62-

involved states" in light of the following factors:

> (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct of repairing the consequences of injurious acts.

Article 3515 provides that a court should consider "(1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems...." La. Civ. Code art. 3515. Here, those factors weigh in favor of Louisiana law. Specifically, the Gulf Fleet entities are based in Louisiana, the focus of the two agreements at issue was to be services provided to a Louisiana-based business, the payments involving the *M/V Gulf Tiger* were made to Louisiana-based Thoma-Sea, and the obligations created by the $2.9 promissory note involve the property of and payment of funds by a Louisiana-based business. In contrast, the only contact with Delaware is the fact that some of the Gulf Fleet entities were formed under Delaware law. With respect to Florida, the sole contact is H.I.G.'s principal place of business. Based on the court's consideration and evaluation of these contacts, the court concludes that Louisiana's policies would be most seriously impaired if its law is not applied to the

-63-

Trustee's conversion claim.

The Louisiana Civil Code does not specifically identify a cause of action for "conversion." Conversion is a common law doctrine. However, Louisiana courts have identified a type of delictual action often termed "conversion" where "(1) possession is acquired in an unauthorized manner; (2) the chattel is removed from one place to another with the intent to exercise control over it; (3) possession of the chattel is transferred without authority; (4) possession is withheld from the owner or possess; (5) the chattel is altered or destroyed; (6) the chattel is used improperly; or (7) ownership is asserted over the chattel." Dual Drilling Co. v. Mills Equip. Invest., Inc., 721 So.2d 853, 857 (La. 1998). While the H.I.G. Defendants argue that the payment of money cannot support a delictual action for conversion, cases appear to recognize a delictual action for conversion of money. See, e.g., Trust for Melba Margaret Schwegmann v. Schwegmann Family Trust, 51 So. 3d 737, 741 (La. App. 5th Cir. 2010). Nevertheless, the Trustee's allegations do not satisfy the essential elements of a conversion claim. Specifically, the Trustee has not pled facts to show how the defendants acquired possession "in an unauthorized manner" with respect to the payment of legal fees, the execution of the promissory note, the funding of the M/V Gulf Tiger, or the payments pursuant to the CSA and PSA. Nor does the Complaint address the

-64-

other elements of a conversion claim. The court, therefore, grants the H.I.G. Defendants' Motion to Dismiss with respect to Count 8, but will grant the Trustee leave to re-plead.

**H. Counts 9 and 10: Unjust Enrichment and Quantum Meruit**

In Counts 9 and 10 of the Complaint, the Trustee challenges the $1 million in equipment, materials, and labor provided to Thoma-Sea for the *M/V Gulf Tiger*, the $500,000 in legal fees that Gulf Fleet paid on H.I.G.'s behalf, as well as payments under the CSA and PSA on the grounds of unjust enrichment under Louisiana Civil Code article 2298 and quantum meruit. With respect to unjust enrichment under Louisiana law, the Trustee must plead and prove that (1) the defendant was enriched, (2) there was an absence of justification, and (3) there is an absence of a remedy at law. See La. Civ. Code art. 2298. This doctrine, however, generally does not apply to cases where a contract governs the parties' relationship because the contract provides a legal remedy for the parties. See, e.g., T. L. James & Co. v. Traylor Bros., 294 F. 3d 743, 747 (5th Cir. 2002) (plaintiff could not satisfy the fifth element of an unjust enrichment claim – that there is no remedy at law – because the contract provided a legal remedy) (citing Morphy, Makofsky & Masson, Inc. v. Canal Place 2000, 538 So. 2d 569, 575 (La. 1989)). Accordingly, the Trustee cannot state an unjust enrichment claim for payments made pursuant to the CSA and the PSA. With respect to the

-65-

payments made on the *M/V Gulf Tiger* and the reimbursement of legal expenses, the Trustee alleges that those payments were not made pursuant to a contract. Accordingly, the court agrees that, with respect to these payments, the Trustee has stated a claim for unjust enrichment under Louisiana Civil Code article 2298.

With respect to the Trustee's quantum meruit claim in Count 10 of the Complaint, Louisiana law governs this claim because the transactions challenged in Count 10 originated or centered in Louisiana. Louisiana courts have recognized that "quantum meruit is an equitable remedy, based on former LSA-C.C. article 1965, which provided that 'no one ought to enrich himself at the expense of another,' and on LSA-C.C. articles 2292-2294, relating to quasi-contracts." <u>Sam Staub Enterprises, Inc. v. Chapital</u>, 88 So. 3d 690, 695 (La. App. 4th Cir. 2012) (citing <u>Coastal Timbers, Inc. v. Regard</u>, 483 So. 2d 1110, 1113 (La. App. 3rd Cir. 1986)). As with an unjust enrichment claim, a quantum meruit claim is inapplicable where there is a contract between the parties. Accordingly, for the reasons set forth with respect to the Trustee's unjust enrichment claim, the Trustee cannot state a quantum meruit claim with respect to payments made under the PSA and the CSA, and grants the H.I.G. Defendants' Motion to Dismiss with respect to the quantum meruit claims based on those payments. The court, however, denies the Motion to Dismiss with respect to the quantum meruit claims based

on payments that the Trustee alleges were not made pursuant to contracts.

## I.  Count 12:  Single Business Enterprise

In Count 12 of the Complaint, the Trustee asserts that Gulf Fleet Holdings, all of the Gulf Fleet-affiliated entities, H.I.G., all of the H.I.G.-affiliated defendants, and Mssrs. Tamer, Zanarini, and Fox operated as a "single business enterprise" and that, under Louisiana's single business enterprise doctrine, the defendants are liable for all the debts of Gulf Fleet.  Specifically, the Trustee alleges that the single business enterprise arose when Gulf Fleet and its affiliates "acted in conjunction with H.I.G. and the H.I.G. Employees to further the enterprise goal of H.I.G." (Complaint at ¶145). With respect to H.I.G. and its subsidiaries, the Trustee contends that these entities "show a deliberate fracturing of a single business between thinly capitalized companies with identical control, offices, and ownership."  (Complaint at ¶ 148).  As a result "H.I.G. treated all of the H.I.G. Subsidiaries (including the Gulf Fleet consolidated  entities) as a single business enterprise" and thus "is liable for all of the debts of the Gulf Fleet enterprise." (Id.).  The Trustee further alleges that:

- All of the companies had identical ownership and leadership; the business functions of H.I.G. and its subsidiaries were "supplementary" in the sense that H.I.G.'s subsidiaries "existed exclusively as subsidiaries of H.I.G. to fund one-off deals in an attempt to insulate H.I.G. from liability";

-67-

- H.I.G.'s officers and directors acted in their own interest as opposed to the interest of Gulf Fleet;

- H.I.G. directly financed its subsidiaries;

- H.I.G.'s Subsidiaries "were never capitalized, or were thinly capitalized";

- H.I.G. formed subsidiaries for each "one-off deal" before closing a transaction;

- H.I.G. funded the closing costs and professional fees of the subsidiaries it formed for its "one-off deals";

- Gulf Fleet and H.I.G.'s subsidiaries shared common offices;

- Gulf Fleet and H.I.G.'s subsidiaries used the same accountants and attorneys;

- H.I.G.'s employees "regularly 'negotiated' deals on behalf of H.I.G. Subsidiaries, which were not real negotiations, but rather as directed by H.I.G. as part of its business plan";

- H.I.G.'s formation of new subsidiaries for each "one-off deal" was a means of "fragmenting the enterprise and avoiding creditors."

(Id. at ¶ 147).

### 1. Choice of Law: Louisiana versus Delaware Law.

The Trustee's allegations in Count 12 are grounded on the single business enterprise doctrine set forth in <u>Green v. Champion Ins. Co</u>., 577 So. 2d 249 (La. App. 1st Cir.), writ denied, 580 So. 2d 668 (1991). The Trustee contends that Louisiana law governs his single business enterprise allegations because the enterprise was formed in Louisiana and the actions taken by Gulf Fleet and the defendants occurred in Louisiana. The H.I.G. Defendants, however,

-68-

argue that the Trustee is merely asserting a veil-piercing claim that should be governed by the law of the state of each entity's incorporation. Under Louisiana's choice-of-law rules, the law of the state of incorporation governs a request to pierce the corporate veil. See Patin v. Thoroughbred Power Boats, Inc., 294 F. 3d 640, 647 (5th Cir. 2002) (citing Quickick, Inc. v. Quickick Int'l, 304 So. 2d 402, 406 (La. App. 1st Cir.) writ denied, 305 So. 2d 123 (1974) (agreeing with "the district court's determination that the Louisiana State Supreme Court would most likely conclude the law of the state of incorporation governs the determination when to pierce a corporate veil."); see also Lonestar Industries, Inc. v. Redline, 757 F. 2d 1544, 1548 n.3 (5th Cir. 1985) (same); In re CLK Energy Partners, LLC, 2010 WL 1930065 at * 6 (Bankr. W.D. La. May 12, 2010) (same). The Trustee argues that this choice-of-law rule is inapplicable to his claim in Count 12 because Louisiana's single business enterprise doctrine is not a traditional veil-piercing claim. According to the Trustee, a traditional alter ego or veil-piercing claim imposes liability on a parent company or shareholder, while the single business enterprise doctrine "imposes liability on entities that may not be parent-subsidiary entities because those entities behave as a single entity." (Trustee's Memorandum Opposing H.I.G. Defendants' Motion to Dismiss at 24). The Trustee's argument requires closer examination of Louisiana's single business

-69-

enterprise doctrine.

The concept of the "corporate veil" is rooted in the protections afforded by the limited liability of corporate owners. In Louisiana and elsewhere, a corporation is deemed a distinct legal entity separate from its shareholders. See Riggins v. Dixie Shoring Co., 590 So. 2d 1164, 1167 (La. 1991); Brennan's, Inc. v. Colbert, 85 So. 3d 787, 791 (La. App. 4th Cir. 2012). This distinction between corporation and shareholder insulates a corporation's shareholders from personal liability for the corporation's debts. Riggins, 590 So. 2d at 1167; N. Hayes & Associates Realty Co., LLC v. Moliere, 982 So. 2d 173, 178 (La. App. 5th Cir. 2008); La. R.S. 12:93 (codifying the limited liability of corporate shareholders). Courts have recognized that this limitation of shareholder liability "promote[s] commerce and industrial growth by encouraging [shareholders] to make capital contributions to corporations without subjecting all of their personal wealth to the risks of business." Smith v. Cotton's Fleet Service, Inc., 500 So. 2d 759, 762 (La. 1987). Applying this principle of limited liability, parent corporations can create and conduct their business through separately incorporated subsidiaries without incurring liability for the debts of their subsidiaries. The fact that a subsidiary is wholly owned and controlled by its parent corporation, or that a parent corporation and a subsidiary share management and offices

-70-

does not, standing alone, open a parent company to liability for the debts of its separately incorporated subsidiaries. See Riggins, 590 So. 2d at 1168-69.

As in most jurisdictions, however, Louisiana courts recognize that under certain circumstances the corporate veil may be pierced to impose personal liability on a corporation's owners. Id. Traditional veil-piercing doctrines are generally limited to cases where the separate existence of the corporation has been abused and where the court finds that piercing the corporate veil is necessary to remedy fraud, illegality, or other inequitable conduct by the corporation's shareholders. Id. In this regard, Louisiana courts have recognized traditional veil-piercing theories such as the alter ego doctrine. See Id. at 1168. The alter ego doctrine allows courts to disregard corporate formalities "to the extent that the corporation ceases to be distinguishable from its shareholders." Id. (citing Gordon v. Baton Rouge Stores Co., 121 So. 759 (La. 1929)). Factors that Louisiana courts consider in applying the alter ego doctrine include: "(1) co-mingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings." Id. Louisiana courts do not require proof

-71-

of actual fraud to pierce the corporate veil under the alter ego doctrine. However, if allegations of fraud are absent, a party bears "a heavy burden of proving that the shareholders disregarded the corporate entity to such an extent that it ceased to become distinguishable from themselves." <u>Id</u>.

In <u>Green v. Champion Ins. Co</u>., the court created a new distinct doctrine for disregarding the legal distinctions between separate corporate entities and imposing personal liability for the debts of one corporation on a separate, but affiliated company. The <u>Green</u> case involved the well-publicized failure of a large insurance company with multiple affiliated "sister" companies. In traditional veil-piercing cases, courts pierce the veil between corporation and shareholder. Here, however, there was no shareholder relationship between the failed insurer and its sister companies. Nevertheless, the court allowed the liquidator of the failed insurance company to seize not only the insurance company's assets, but also the assets of its sister companies. The court held that "the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation." 577 So. 2d at 257. According to the court, when "corporations represent precisely the same interest" or "a single corporation has been fragmented into branches that are separately incorporated and are managed by a

dominant or parent entity, or have interlocking directorates," the separate corporate existence of each affiliated company may be disregarded regardless of whether or not there is a shareholder relationship. Id. Instead of the traditional five-factor test for imposing alter ego liability outlined in Riggins, the Green court identified eighteen factors that courts should consider in whether or not to impose liability under the single business enterprise doctrine:

1. corporation with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;

2. common director or officers;

3. unified administrative control of corporation whose business functions are similar or supplementary;

4. directors and officers of one corporation act independently in the interest of that corporation.

5. corporation financing another corporation;

6. inadequate capitalization;

7. corporation causing the incorporation of another affiliated corporation;

8. corporation paying the salaries and other expenses or losses of another corporation;

9. receiving no business other than that given to it by its affiliated corporation;

10. corporation using the property of another

-73-

corporation as its own;

11.  noncompliance with corporate formalities;

12.  common employees;

13.  services rendered by the employees of one
     corporation on behalf of another corporation;

14.  common offices;

15.  centralized accounting;

16.  undocumented transfer of funds between
     corporations;

17.  unclear allocation of profits and losses
     between corporations; and

18.  excessive fragmentation of a single enterprise
     into separate corporations.

577 So. 2d at 257-58.  Following the <u>Green</u> case, courts outside of Louisiana's First Circuit have applied the single business enterprise doctrine in varying forms, although some commentators have criticized the broad scope of the doctrine and some courts have attempted to tether the doctrine to more traditional veil-piercing doctrines.  <u>See</u>, <u>e.g.</u>, Kyle M. Bacon, "The Single Business Enterprise Theory of Louisiana's First Circuit: An Erroneous Application of Traditional Veil-piercing," 63 La. L. Rev. 75 (Fall 2002); <u>Town of Haynesville, Inc. v. Entergy Corp.</u>, 956 So. 2d 192, 195-99 (La. App. 2d Cir. 2007) (applying traditional veil-piercing requirements to claim that affiliated entities were a single business enterprise).

-74-

## 2. The Trustee's Single Business Enterprise Claim is A Veil-Piercing Claim For Purposes of Choice of Law.

Considering the Trustee's allegations in the context of the single business enterprise doctrine developed by Louisiana courts, the court concludes that the claims in Count 12 of the Complaint should be governed by the choice-of-law rules applicable to veil-piercing claims. First, although the _Green_ court developed and applied the single business enterprise doctrine in a context different from traditional veil-piercing doctrines, and applied a multi-factor test that differs from the traditional five-factor test applied by Louisiana courts for alter ego claims, the doctrine is nevertheless grounded on the same policies and doctrinal underpinnings as traditional veil-piercing theories such as the alter ego doctrine. For example, the _Green_ court expressly links its eighteen-factor test to the factors that courts consider in determining whether to pierce the corporate veil under the alter ego doctrine. _See_ 577 So. 2d at 258 ("these factors are similar to factors that have been used in Louisiana 'piercing the veil' cases.") The _Green_ court also expressly references the alter ego doctrine as a factor relevant to whether or not affiliated entities constitute a single business enterprise. _Id_. Finally, courts that have subsequently applied _Green's_ single business enterprise doctrine tend to explicitly link that doctrine to traditional veil-

-75-

piercing doctrines.  See <u>Town of Haynesville, Inc</u>., 956 So. 2d at 196-99 (treating the single business enterprise doctrine as a form of corporate veil-piercing); <u>Peyton Place, Condominium Associates, Inc. v. Gustella</u>, 18 So. 3d 132 (La. App. 5th Cir. 2009) (applying traditional veil-piercing principles in rejecting a single business enterprise claim); <u>In re Ark-La-Tex Timber Co., Inc</u>., 482 F. 3d 319, 335 (5th Cir. 2007) (framing Louisiana's single business enterprise doctrine in the same terms as traditional veil-piercing doctrines by noting that where "a group of affiliated corporations constitutes a single business enterprise, a court may 'disregard the concept of corporate separateness and extend liability to each of the affiliated corporations' for the purpose of preventing fraud or achieving equity.").

Applying the same choice-of-law rule for traditional veil-piercing doctrines to the Trustee's claims in Count 12 is also consistent with the underlying rationale for applying the law of the state of formation to veil-piercing claims.  Courts that apply the law of the state of incorporation to veil-piercing claims do so because these claims implicate matters of internal corporate operations and organization that are typically governed by the law of the state of incorporation, including the rights and duties of shareholders, the corporate formalities that must be observed by the corporation, and the rules governing the limited liability of

-76-

shareholders.  See, e.g., Fusion Capital Fund II, LLC v. Ham, 614 F.3d 698, 700 (7th Cir. 2010) (whether a corporation's investors are liable for its debts "is an aspect of the internal affairs doctrine," which dictates application of the law of the state of formation).  Although the Trustee correctly notes that Louisiana's single business enterprise doctrine is not tied to a parent-subsidiary or shareholder relationship, the eighteen-factor test announced in Green bears directly on the organization and operation of a corporation and corporate group.  See 577 So.2d at 257-58. Moreover, to the extent that this doctrine allows courts to ignore the boundaries between affiliated companies, it implicates state corporate law that limits the extent to which the liability of a corporation can be imputed to a separate, albeit affiliated company.

Finally, the effect of a single business enterprise determination in this case is the same as a determination of liability under a traditional veil-piercing theory such as the alter ego doctrine.  Specifically, under an alter ego doctrine, the Trustee would seek to impose liability on H.I.G. and its affiliates on the grounds that they are the alter egos of the Gulf Fleet entities.  The result of such an alter ego finding would be that the Trustee could pierce the corporate veil of Gulf Fleet and allow Gulf Fleet's creditors to recover from the assets of the H.I.G. Defendants.  Compare Lee v. Clinical Research Center of Florida,

-77-

L.C., So.2d 317, 323 (La. App. 4th Cir. 2004) (a finding that a corporate group operated as a single business enterprise results in the pooling of the assets of the affiliated members of the group for purposes of paying creditors), with Mentz Const. Services, Inc. v. Poche, 54 So.2d 1221, 1224 (La. App. 4th Cir. 2010) (alter ego finding results in a corporate shareholder being held liable for the debts of the subsidiary). In sum, Louisiana's single business enterprise doctrine may differ from traditional veil-piercing theories and may expand the scope of potential liability within corporate groups (although the breadth of the doctrine has been challenged in post-Green decisions), the single business enterprise doctrine is still, at its core, a veil-piercing remedy designed to disregard the boundaries of separate corporate entities and impose personal liability for the debts of one member of a corporate group onto all the members of the group.

### 3. Applying Delaware Law on Piercing the Corporate Veil.

Applying Louisiana's choice-of-law rule for veil-piercing claims, the court will look to the law of the state of incorporation. Here, the Trustee is seeking to pierce the corporate veil of Gulf Fleet and impose personal liability on Gulf Fleet's immediate parent, as well as the other members of H.I.G.'s corporate group. Accordingly, the court will look to the state of incorporation of Gulf Fleet, which is Delaware. See, e.g., ASARCO,

-78-

LLC, 382 B.R. at 65 (looking to the law of the state of incorporation of the subsidiary in determining whether to hold a parent company liable for the debts of its subsidiary by piercing the corporate veil of the subsidiary). Delaware has not adopted the same "single business enterprise" doctrine adopted by Louisiana and pled in Count 12 of the Complaint. Delaware does, however, recognize the traditional alter ego doctrine as grounds to pierce the corporate veil in cases involving the members of a corporate group. To state an alter ego claim under Delaware law, the Trustee must plead (1) that Gulf Fleet and the H.I.G. defendants "operated as a single economic entity" and (2) that an "overall element of injustice or unfairness" is present. See In re Moll Industries, Inc., 454 B.R. 574, 587 (Bankr. D. Del. 2011) (quoting In re Broadstripe, LLC, 444 B.R. 51, 101 (Bankr. D. Del. 2010)). The factors relevant to whether one or more companies constitute a "single economic entity" include: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." Broadstripe, 444 B.R. at 102. With respect to the second prong the alter ego doctrine –

-79-

the presence of injustice or unfairness - while proof of actual fraud is not required, courts have held that "something like fraud must be proven" and that a party seeking to pierce the corporate veil must prove "reasonable reliance and intent to deceive." In re Moll Industries, Inc., 454 B.R. at 591 (citing In re Foxmeyer, 290 B.R. 229, 236 (Bankr. D. Del. 2003)).

Applying the requirements for a Delaware alter ego claim to Count 12, the Trustee's single business enterprise allegations do not support a claim under Delaware law for three reasons. First, the Trustee has failed to plead sufficient facts to support a plausible claim that the H.I.G.-affiliated defendants and Gulf Fleet amounted to "a single economic entity." The Trustee's allegations of payments made to or for the benefit of H.I.G. or its affiliates may arguably address the "siphoning of funds" element of the single economic entity prong of Delaware's alter ego doctrine. Siphoning of a corporation's funds by a dominant shareholder suggest "the improper taking of funds that the owner was not legally entitled to receive." In re Autobacs Strauss, Inc., 473 B.R. 525, 557 (Bankr. D. Del. 2012) (quoting In re The Heritage Organization, LLC, 413 B.R. 438, 517 n. 69 (Bankr. N. D. Tex. 2009)). The amended complaint includes allegations that Gulf Fleet committed money and resources toward the completion of the M/V Gulf Tiger for the benefit of H.I.G. when it had no obligation to do so, and further

-80-

that Gulf Fleet reimbursed the expenses of H.I.G.'s employees for matters unrelated to the business of Gulf Fleet. The Trustee alleges that Gulf Fleet had no contractual obligation to make those payments and that those payments did not benefit Gulf Fleet or Gulf Fleet's creditors. On the other hand, the allegations of payments made pursuant to the notes and the PSA and CSA would not support the claim of "siphoning of funds" because the payments were made pursuant to contracts between the parties. See Moll Industries, Inc., 454 B.R. at 590 (payments pursuant to the terms of a note did not constitute "siphoning of funds"). Moreover, while the Complaint includes sufficient allegations with respect to Gulf Fleet's insolvency, the Trustee does not plead sufficient facts to satisfy the other factors supporting a claim that H.I.G. and Gulf Fleet operated as a single economic entity. To the contrary, the Trustee's own allegations show that H.I.G. and Gulf Fleet operated as two distinct businesses: H.I.G. and its affiliates are private equity investors with a principle place of business in Miami, Florida, while Gulf Fleet had operated an offshore transportation business in Louisiana for eight years prior to its purchase by H.I.G. The Trustee does not plead facts showing that H.I.G. and Gulf Fleet co-mingled funds, that Gulf Fleet and H.I.G. failed to maintain corporate records, or that they failed to observe corporate formalities. Indeed, the fact that Gulf Fleet carried on a distinct

-81-

business for eight years prior to its purchase by H.I.G. tends to undercut a finding that Gulf Fleet was "merely a facade for the operations of" H.I.G. In re Moll Industries, Inc., 454 B.R. at 589 (noting that the facts pled in the Complaint show that the entities at issue "conducted fundamentally different businesses" and that such facts are "fatal to any argument that Moll was a mere facade" for the other entity); In re Foxmeyer, 290 B.R. at 244 (facts showing that a subsidiary operated a pharmaceutical distribution business while the parent conducted "discreet albeit related" businesses was not sufficient to support a finding that the subsidiary was merely a facade); In re Broadstripe, LLC, 444 B.R. at 103-104. The Broadstripe court confronted a similar set of facts where a private equity firm had invested in a company that ultimately sought protection under the Bankruptcy Code. The unsecured creditors committee filed a complaint seeking, inter alia, a determination that the debtor was the alter ego of the private equity firm. Id. Despite allegations that the private equity firm's employees served on the debtor's board and controlled the debtor's operations in a manner beneficial to the private equity firm, the court concluded that the allegations did not support a finding that the private equity firm and the debtor operated as a single economic entity. Id. Specifically, the court concluded that the debtor and the private equity firm operated two distinct types

-82-

of businesses with different headquarters, employees, and administrative operations. According to the court, allegations that employees of the private equity firm were using their role inside the debtor to benefit the private equity firm did not "create triable issues of fact that [the debtor] and [the private equity firm] were a single economic entity." Id. at 104.

Second, the Trustee's allegations do not support the second prong of an alter ego claim under Delaware law: the presence of fraudulent intent, inequitable conduct, or injustice. While Delaware courts do not require proof of actual fraud, Delaware courts have held that a plaintiff must plead facts establishing "something like fraud" and that the distinction between actual fraud and the requirement to plead injustice or unfairness as part of an alter ego claim is "largely superficial." In re Moll Industries, Inc., 454 B.R. at 591. The Trustee's allegations do not satisfy this standard. Allegations of injustice or unfairness must be grounded on a misuse or abuse of the corporate forum. Here, as explained above, the facts pled in the Complaint do not support the Trustee's claim that Gulf Fleet was merely a facade for H.I.G. or that H.I.G. and Gulf Fleet operated as a single economic unit. While the Trustee does allege fraudulent transfers, those transfers are predominately grounded on allegations of constructive fraud and not the illegal and inequitable conduct required to support piercing

-83-

the corporate veil under Delaware law. With respect to the Trustee's allegations of actual fraud in connection with these transfers, the court previously held that the Trustee has not sufficiently pled fraud to satisfy the standards of Rule 9(a) or <u>Iqbal</u> and <u>Twombly</u>.

Third, the Trustee has failed to plead facts supporting his request to pierce the corporate veil of each of the H.I.G.-affiliated defendants. Under Delaware law, if a plaintiff seeks to establish liability for all members of a corporate group, it must "establish alter ego liability with respect to each one of the entities." <u>See</u> <u>In re The Heritage Org. LLC</u>, 413 B.R. at 514 ("The Delaware two-prong test must be applied to, and satisfied at, each level or layer of ownership applicable within the multi-faceted entity structure."); <u>See</u> <u>also</u> <u>In re Foxmeyer</u>, 290 B.R. at 243-44 (same). The Trustee has not pled facts - as opposed to conclusions - sufficient to support alter ego liability at all layers of the H.I.G. corporate group.[10] In sum, Count 12 of the Complaint must be

_____

[10]In the <u>Moll Industries</u> case, the court rejected an argument that the plaintiff had to establish alter ego liability for each layer of a corporate group because, unlike the <u>Heritage Org</u>. case, the plaintiff was not seeking to impose liability on multiple members of the corporate group. In contrast, here the Trustee seeks to impose liability on multiple members of the H.I.G. corporate group. Accordingly, the Trustee must satisfy the requirement for pleading alter ego liability at each level of the H.I.G. corporate group as required in the <u>Heritage Org</u>. case.

-84-

dismissed because the Trustee bases his claim on Louisiana law, which is inapplicable to the veil-piercing relief sought in Count 12, and the allegations that are pled are not sufficient to state a claim for alter ego liability under Delaware law.  The court, therefore, grants the H.I.G. Defendants' Motion to Dismiss with respect to Count 12, but grants the Trustee leave to re-plead.

**J.  Count 11:  Partnership Liability**

In Count 11 of the Complaint, the Trustee alleges that the H.I.G. defendants and Gulf Fleet formed a partnership under Louisiana law and that the H.I.G. defendants are liable as partners for the debts incurred by Gulf Fleet.  Like a corporation, a partnership is a distinct legal entity that is separate from its partners.  <u>Dantzler v. Gilchrist Const. Co</u>., 704 So. 2d 341, 343 (La. App. 3rd Cir. 1997).  A partnership may be formed by an oral or written agreement.  However, a partnership, like a joint venture, arises only when the parties intend the relationship to exist.  <u>See Price Farms, Inc. v. McCurdy</u>, 42 So. 3d 1099, 1107 (La. App. 2nd Cir. 2010)  Thus, there must be some evidence of an agreement to participate "equally in profits, commercial benefits, and losses of the partnership."  <u>Tedeton v. Tedeton</u>, 87 So. 3d 914 (La. App. 2nd Cir. 2012) (citing Louisiana Civil Code article 2803).  While the Trustee pleads generally that the parties formed a partnership and that the parties intended to act as partners in Gulf Fleet's

-85-

business, there are no specific facts that would support a claim that the parties intended to form a partnership under Louisiana law and that they had agreed to participate equally in the profits, commercial benefits, and losses of Gulf Fleet's business. Accordingly, the court grants the H.I.G. Defendants' Motion to Dismiss with respect to Count 11 of the Complaint, but grants the Trustee leave to re-plead.

## K. The Brightpoint Motion

Brightpoint filed a separate Motion to Dismiss and Motion for More Definite Statement on the grounds that the Complaint fails to assert specific allegations against Brightpoint, but instead merely groups Brightpoint into the Trustee's definition of "H.I.G. Subsidiaries." The court agrees with Brightpoint in this regard. With respect to all of the Trustee's claims, the Trustee must allege specific facts to establish conduct by Brightpoint that serves as a basis for liability against Brightpoint. As explained previously, the Trustee cannot rely on Louisiana partnership law, Louisiana's single business enterprise doctrine, or Delaware veil-piercing principles to impute liability up and down the H.I.G. corporate chain. Here, Brightpoint is referenced three times in the Complaint and with respect to the allegations that form the basis of the Trustee's claims, Brightpoint is merely consolidated into the definition of "H.I.G. Subsidiaries." Accordingly, the court grants

-86-

Brightpoint's motion and requires the Trustee to re-plead his complaint to include specific allegations showing conduct by Brightpoint that gives rise to each of the claims asserted against Brightpoint.

**L.** ***Stern v. Marshall* and Authority to Enter an Order on the Motion to Dismiss**

As a final matter, the court concludes that it has authority to enter an order on the Motion to Dismiss under <u>Stern v. Marshall</u>, \_\_\_\_ U.S. \_\_\_\_, 131 S. Ct. 2594 (2011). Courts have held that an order denying a motion to dismiss in part, and granting leave to re-plead is not a final order within the meaning of <u>Stern v. Marshall</u>. <u>See</u> <u>In re Pompa</u>, 2012 WL 2571156 at * 1 (Bankr. S. D. Tex. June 29, 2012); <u>In re Noram Resources, Inc</u>., 2011 WL 6936361 at * 1 (Bankr. S. D. Tex. Dec. 30, 2011); <u>In re TMG Liquidation Co</u>., 2012 WL 4467553 at * 2 (Bankr. D.S.C. Sept. 26, 2012). However, to the extent that this matter is deemed to fall within the class of cases where this court lacks authority to enter an order, these Reasons for Decision shall serve as the court's report and recommendation under 28 U.S.C. § 157.

CONCLUSION

For the reasons set forth herein, the court **GRANTS** the H.I.G. Defendants' Motion to Dismiss **IN PART** and **DENIES** the Motion **IN PART**. The court further **GRANTS** Brightpoint's Motion to Dismiss and Rule

12(e) Motion for More Definite Statement.  The court further **GRANTS** the Trustee leave to re-plead his claims.  The Trustee shall have thirty (30) days to file an amended complaint that complies with the court's ruling herein.  The defendants will have twenty (20) days from the filing of the amended complaint to answer, respond, or otherwise move with respect to the amended complaint.

Within 10 days, counsel for each Defendant shall submit orders in conformity with the foregoing Reasons for Decision as to their respective motions, to be approved as to form by counsel for Trustee.

###